**INSTITUT PASTEUR and Pasteur Sanofi Diagnostics, Appellants,**

**v.**

**CAMBRIDGE BIOTECH CORPORATION,**
**Appellee.**

**No. 96–2028.**

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 1996.

Decided Jan. 17, 1997.

Jeffrey D. Sternklar, with whom Michael Gottfried and Burns & Levinson, L.L.P., Boston, MA, were on brief, for appellants.

Joseph F. Ryan, with whom Jeffrey L. Jonas, Anthony L. Gray, Andrew P. Strehle and Brown, Rudnick, Freed & Gesmer, P.C., Boston, MA, were on brief, for appellee.

Before CYR, BOUDIN and LYNCH, Circuit Judges.

CYR, Circuit Judge.

Unsuccessful in their intermediate appeal to the district court, Institut Pasteur and Pasteur Sanofi Diagnostics [collectively: "Pasteur"] again appeal from the bankruptcy court order which confirmed the chapter 11 reorganization plan ("Plan") proposed by debtor-in-possession Cambridge Biotech Corporation ("CBC"), the holder of two licenses to utilize Pasteur patents. The Plan provision central to the present dispute calls for the sale of all CBC stock to a subsidiary of bioMerieux Vitek, Inc. ("bioMerieux"), a major competitor of appellant Pasteur. Finding no error, we affirm.

# I

## BACKGROUND

CBC manufactures and sells retroviral diagnostic tests for detecting the human immunodeficiency virus (HIV) associated with AIDS. Its HIV diagnostics division annually generates approximately $14 million in revenues. Institut Pasteur, a nonprofit French foundation engaged in AIDS-related research and development, owns various patented procedures for diagnosing HIV Virus Type 2 ("HIV2 procedures"). Pasteur Sanofi Diagnostics holds the exclusive right to use and sublicense Institut Pasteur's patents.

In October 1989, CBC and Pasteur entered into mutual cross-license agreements, whereby each acquired a nonexclusive perpetual license to use some of the technology patented or licensed by the other. Specifically,

CBC acquired the right to incorporate Pasteur's HIV2 procedures into any diagnostic kits sold by CBC in the United States, Canada, Mexico, Australia, New Zealand and elsewhere.[1]

Each cross-license broadly prohibits the licensee from assigning or sublicensing to others. See Royalty–Free Cross–License, at § 7.1; Royalty–Bearing Cross–License, at § 8.1 ("[N]o other person shall acquire or have any right under or by virtue of this Agreement."). Nevertheless, either Pasteur or CBC was authorized to "extend to its Affiliated Companies the benefits of this Agreement so that such party shall remain responsible with regard [to] all [license] obligations." Id. § 1.4. "Affiliated Company" is defined as "an organization which controls or is controlled by a party or an organization which is under common control with a party." Id.

CBC filed its chapter 11 petition on July 7, 1994, and thereafter continued to operate its retroviral diagnostic testing business as debtor-in-possession. Its reorganization plan proposed that CBC assume both cross-licenses, see 11 U.S.C. § 365 (executory contracts),[2] continue to operate its retroviral diagnostics division utilizing Pasteur's patented HIV2 procedures, and sell all CBC stock to a subsidiary of bioMerieux, a giant French biotechnology corporation and Pasteur's direct competitor in international biotechnology sales. Pasteur previously had licensed bioMerieux to use its HIV2 procedures, but the earlier license related to a single product manufactured by bioMerieux (i.e., bioMerieux's VIDAS automated immunoassay test system), and applied only to VIDAS sales in markets other than the United States, Canada, Mexico, Australia, and New Zealand, markets expressly encompassed within the CBC cross-licenses.

Not surprisingly, in due course Pasteur objected to the Plan. Citing Bankruptcy Code § 365(c), 11 U.S.C. § 365(c), it contend-

---

1. These cross-licenses expressly provide that Massachusetts law governs their interpretation. See Royalty–Free Cross–License, at § 9; Royalty–Bearing Cross–License, at § 10.

2. The parties agree that the cross-licenses are "executory contracts," since substantial performance remains due by both parties. See Summit Inv. & Dev. Corp. v. Leroux (In re Leroux), 69 F.3d 608, 610 n. 3 (1st Cir.1995).

ed that the proposed sale of CBC's stock to bioMerieux amounted to CBC's assumption of the patent cross-licenses and their *de facto* "assignment" to a third party in contravention of the presumption of nonassignability ordained by the federal common law of patents, as well as the explicit nonassignability provision contained in the cross-licenses. Isabelle Bressac, Pasteur's licensing director, attested that Pasteur would not have granted its competitor, bioMerieux, or a subsidiary, a patent license under the terms allowed CBC.

The bankruptcy court authorized CBC to assume the cross-licenses over Pasteur's objection. It ruled that the proposed sale of CBC stock to bioMerieux did not constitute a *de facto* "assignment" of the cross-licenses to bioMerieux, but merely an assumption of the cross-licenses by the reorganized debtor under new ownership, and that Bankruptcy Code § 365(c) enabled CBC to assume the cross-licenses as debtor-in-possession because the prepetition licensing relationship between Pasteur and CBC was neither "unique" nor "something in the category of a personal services contract." *In re Cambridge Biotech Corp.*, No. 94–43054, slip op. at 17–18, 24 (Bankr.D.Mass. Sept. 18, 1996); Tr. 176–77.[3] The district court upheld the bankruptcy court ruling on intermediate appeal.

## II

## DISCUSSION

### A. *Appellate Jurisdiction*

Citing our decision in *Rochman v. Northeast Utils. Serv. Group (In re Public Serv. Co. of N.H.)*, 963 F.2d 469 (1st Cir.) (*"Public Service"*), *cert. denied*, 506 U.S. 908, 113 S.Ct. 304, 121 L.Ed.2d 226 (1992), CBC now moves to dismiss the appeal for lack of appellate jurisdiction. It contends that Pasteur failed to pursue all available remedies for preserving a temporary stay of the confirma-

tion order pending appeal after this court lifted the temporary stay on October 9, 1996.[4] *See Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.)*, 652 F.2d 793, 798 (9th Cir.1981) (noting that appellant should file motion to stay judgment with Circuit Justice if necessary). Since CBC substantially *consummated* its Plan on October 21, 1996, it argues that Pasteur can no longer be afforded complete relief because neither this court nor the bankruptcy court has jurisdiction over the many third parties affected by, and much of the *res* distributed pursuant to, the consummated Plan. Finally, CBC argues, no court can now provide Pasteur with meaningful partial relief, such as selective rescission of the stock sale or the cross-license assumption/assignment provisions, because retention of these cross-licenses by CBC is indispensable to any successful reorganization of its retroviral diagnostics business, and, from bioMerieux's standpoint, is a "deal-busting" component of the Plan. *See* Plan § IX.B.2.a ("[P]rovisions of the Confirmation Order are nonseverable and mutually dependent."). We disagree.

Contrary to CBC's suggestion, our *Public Service* decision does not reduce to the simplistic theme that appellate courts invariably are deprived of jurisdiction by the lack (or premature dissolution) of a stay which results in substantial plan consummation prior to final disposition of the appeal. Rather, we rested our decision in *Public Service* primarily on two circumstantial considerations. *See In re Andreuccetti*, 975 F.2d 413, 418 (7th Cir.1992) (noting that *Public Service* contemplates that " '[t]he court should reach a determination upon close consideration of the relief sought in light of the facts of the particular case' ") (citation omitted).

First, the equities weighed heavily against the appellants in *Public Service*, who repeatedly and inexplicably failed to avail

---

3. The bankruptcy court further found that the Plan had been proposed in good faith, *see* 11 U.S.C. § 1129(a)(3), and that the stock sale to bioMerieux had been negotiated in good faith and at arm's length. *In re Cambridge Biotech Corp.*, No. 94–43054, slip op. at 7, 12.

4. A series of stays had prevented CBC from consummating the Plan by August 2, 1996, as sched-

uled, and a final consummation date was set for October 31, 1996. In early October, CBC asked this court to vacate the pending stay, claiming that further delay threatened irreparable injury. It represented that almost half its employees had quit during the preceding year, jittery clients had begun to cancel contracts, and that its revenues had declined by 10%.

themselves of interlocutory appeals from earlier denials of their requests for stay by the courts below. As a consequence of their notable lack of diligence, a full sixteen months had elapsed from the date of confirmation, during which "implementation of the confirmed plan proceeded apace." *In re Public Serv.,* 963 F.2d at 472. In contrast, Pasteur assiduously preserved its stay throughout the three-month period which elapsed following confirmation, and, on the day this court dissolved the temporary stay, we expedited the Pasteur appeal.

Second, *Public Service* involved extraordinarily intricate Plan provisions, as well as a multi-billion dollar enterprise, with the result that any attempted Plan dismantling following the substantial and unexcused lapses by appellants would have produced " 'a nightmarish situation for the bankruptcy court on remand.' " *Id.* at 474 (citation omitted); *see, e.g., Baker & Drake, Inc. v. Public Serv. Comm'n of Nev.,* 35 F.3d 1348, 1351–52 (9th Cir.1994) (finding appellate jurisdiction, and noting that reorganization plan at issue was "not a complex, billion-dollar affair" like the plans in *Trone* and *Public Service* ). Although the CBC Plan is not without its own complexities, CBC is a much less complex enterprise than Public Service, and its Plan was substantially consummated much more recently in relation to the date of appeal.[5]

We need not resolve the jurisdictional challenge urged upon us by CBC, however, since the merits of Pasteur's contention—that CBC's assumption of the cross-licenses and its sale of stock to the bioMerieux subsidiary contravene Bankruptcy Code § 365(c)—are readily dispatched. *See Casco N. Bank. N.A. v. DN Assocs. (In re DN Assocs.),* 3 F.3d 512, 515 (1st Cir.1993) (noting that appellate court may bypass jurisdictional questions where appeal would falter on merits even assuming jurisdiction) (citing *Norton v. Mathews,* 427 U.S. 524, 532, 96 S.Ct. 2771, 2775–76, 49 L.Ed.2d 672 (1976)).

## B. *The Merits* [6]

Pasteur argues that the CBC Plan effects a *de facto* assignment of its two cross-licenses to bioMerieux, contrary to Bankruptcy Code § 365(c)(1) which provides as follows:

> The trustee [*viz.,* CBC] [7] may not assume or assign any executory contract ..., whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties, if ——
>
>> (1)(A) applicable law excuses a party[ ] other than the debtor[ ] [*viz.,* Pasteur] to such contract ... from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract ... prohibits or restricts assumption or assignment; and
>>
>> (B) such party [*viz.,* Pasteur] does not consent to such assumption or assignment....

11 U.S.C. § 365(c)(1).

Pasteur argues that in order to encourage optimum product innovation the federal common law of patents presumes that patent licensees, such as CBC, may not sublicense to third parties absent the patent holder's consent. *See, e.g., Commissioner v. Sunnen,* 333 U.S. 591, 609, 68 S.Ct. 715, 724–25, 92 L.Ed. 898 (1948). This federal common law rule of presumptive nonassignability thus qualifies as an "applicable law," within the meaning of Bankruptcy Code § 365(c)(1)(A), which precludes Pasteur from being compelled to accept performance from any entity other than CBC—*e.g.,* bioMerieux's subsid-

---

5. The equitable and pragmatic tests employed in *Public Service* are symbiotic. *See In re UNR Indus.,* 20 F.3d 766, 769 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 509, 130 L.Ed.2d 416 (1994) ("There is a big difference between inability to alter the outcome (real mootness) and unwillingness to alter the outcome ('equitable mootness')," and "[u]sing one word for two different concepts breeds confusion"; instead, appellate courts ultimately must ask "whether it is prudent to upset the plan of reorganization at this late date.") (citations omitted).

6. We review the district court's conclusions of law *de novo* and the bankruptcy court's findings of fact for clear error only. *See Petit v. Fessenden,* 80 F.3d 29, 32 (1st Cir.1996).

7. As debtor-in-possession, CBC has substantially the same rights and powers as a chapter 11 trustee, including the power to assume executory contracts under Bankruptcy Code § 365. *See* 11 U.S.C. § .1107.

iary—and therefore prevents CBC from *either* assuming *or* assigning these cross-licenses. *See Everex Sys., Inc. v. Cadtrak Corp. (In re CFLC, Inc.)*, 89 F.3d 673, 679–80 (9th Cir.1996) (federal patent law of nonassignability preempts state law relating to patent license assignability). Further, says Pasteur, even assuming that section 365(c) might allow a debtor simply to assume the cross-licenses *without a subsequent assignment* to a third party, CBC *formally* structured this Plan transaction as an assumption by the debtor-in-possession, whereas *in substance* it was an assignment of the cross-licenses to bioMerieux, a complete stranger to the original cross-licensing agreements.

■ These contentions are foreclosed by our decision in *Summit Inv. & Dev. Corp. v. Leroux (In re Leroux)*, 69 F.3d 608 (1st Cir.1995),[8] which analyzed and interpreted companion Bankruptcy Code subsections 365(c) and (e) and their relevant legislative history.[9] As in the present case, in *Leroux* we were urged to interpret subsections 365(c) and (e) as mandating a "hypothetical test." Under such an approach, the chapter 11 debtor would lose its option to *assume* the contract, even though it never intended to assign the contract to another entity, if either the particular executory contract or the applicable nonbankruptcy law purported to terminate the contract automatically upon the filing of the chapter 11 petition or to preclude its assignment to an entity not a party to the contract. *Id.* at 612.

We rejected the proposed hypothetical test in *Leroux,* holding instead that subsections 365(c) and (e) contemplate a case-by-case inquiry into whether the nondebtor party (*viz.,* Pasteur) *actually* was being "forced to accept performance under its executory contract from someone other than the debtor party with whom it originally contracted." *Id.* Where the particular transaction envisions that the debtor-in-possession would assume and continue to perform under an executory contract, the bankruptcy court cannot simply presume as a matter of law that the debtor-in-possession is a legal entity *materially* distinct from the prepetition debtor with whom the nondebtor party (*viz.,* Pasteur) contracted. *Id.* at 613–14 (citing H.R.Rep. No. 1195, 96th Cong., 2d Sess. § 27(b) (1980); *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984)). Rather, "sensitive to the rights of the nondebtor party (*viz.,* Pasteur)," the bankruptcy court must focus on the performance actually to be rendered by the debtor-in-possession with a view to ensuring that the nondebtor party (*viz.,* Pasteur) will receive "the full benefit of [its] bargain." *Id.* at 612–13 (citing S.Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), *reprinted in* 1980 U.S.C.C.A.N. 5787, 5845).

■ Given the pragmatic "actual performance" test adopted in *Leroux,* the ultimate findings of fact and conclusions of law made by the bankruptcy court[10] below did not constitute error. CBC simply does not occupy the same position as the debtor in *CFLC, Inc.,* 89 F.3d 673 (9th Cir.1996), upon which Pasteur relies most heavily. The Plan in *CFLC, Inc.* unmistakably provided for an outright *assignment* of the debtor's patent license to an entirely different corporation with which the patent holder Cadtrak Corporation had never contracted. *Id.* at 679–80. By contrast, CBC all along has conducted,

---

8. *See Williams v. Ashland Eng'g Co.,* 45 F.3d 588, 592 (1st Cir.) ("In a multi-panel circuit, newly constituted panels are, for the most part, bound by prior panel decisions closely on point."), *cert. denied,* —— U.S. ——, 116 S.Ct. 51, 133 L.Ed.2d 16 (1995).

9. Bankruptcy Code § 365(e)(2)(A) provides that a statutory or contractual termination provision, which is contingent upon the filing of a bankruptcy petition, may be enforceable in bankruptcy if the "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance *to the trustee or to an assignee* of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (ii) such party does not consent to such assumption or assignment...." 11 U.S.C. § 365(e)(2)(A) (emphasis added).

10. We are not persuaded by Pasteur's contention that the failure to cite *Leroux* in the confirmation order indicates that the bankruptcy court failed to follow it. Pasteur itself cited *Leroux* at the July 1996 confirmation hearing, and the bankruptcy court's ultimate findings faithfully track its model.

and proposes to continue, its retroviral diagnostic enterprise as the same corporate entity which functioned prepetition, while utilizing Pasteur's HIV2 procedures in that same prepetition endeavor.

Pasteur nonetheless insists that the reorganized CBC is different than the prepetition entity, not due merely to its chapter 11 filing but because it is now *owned by* a different legal entity than before—namely, bioMerieux's subsidiary *qua* CBC shareholder. Pasteur's contention finds no support, however, either in Massachusetts law, *see supra* note 1, or in the cross-license provisions it negotiated.

■ Stock sales are not mergers whereby outright title and ownership of the licensee-corporation's assets (including its patent licenses) pass to the acquiring corporation. Rather, as a corporation, CBC "is a legal entity distinct from its shareholders." *Seagram Distillers Co. v. Alcoholic Beverages Control Comm'n*, 401 Mass. 713, 519 N.E.2d 276, 281 (1988) (citing 6 William M. Fletcher, Cyclopedia of Corporations § 2456 (1979 & Supp.1986)). Absent compelling grounds for disregarding its corporate form, therefore, CBC's separate legal identity, and its ownership of the patent cross-licenses, survive without interruption notwithstanding repeated and even drastic changes in its ownership. *See id.* (holding that corporation's sale of all its capital stock does not alter its identity, nor effect a transfer of the corporation's executory contracts or licenses); *see also PPG Indus. v. Guardian Indus. Corp.*, 597 F.2d 1090, 1096 (6th Cir.), *cert. denied*, 444 U.S. 930, 100 S.Ct. 272, 62 L.Ed.2d 187 (1979) (same; distinguishing mere sale of stock from a transfer of patent license as part of corporate merger wherein merging licensee ends its corporate existence). Pasteur cites no apposite authority to the contrary.

Furthermore, Pasteur's position finds no support in the negotiated terms of its cross-licenses. As the patent holder—and given CBC's corporate form and the governing Massachusetts law, *supra*—Pasteur was free to negotiate restrictions on CBC's continuing rights under the cross-licenses based on changes in its stock ownership or corporate control. *See id.* at 1095 (parties may override law of merger by negotiating express patent license provision); *see also Seagram*, 519 N.E.2d at 280–81.[11] Nevertheless, these cross-licenses contain no provision either limiting or terminating CBC's rights in the event its stock ownership were to change hands. The generic nonassignability provisions found in these cross-licenses, *see, e.g.*, Royalty–Free Cross–License, at § 7.1 ("This Agreement ... has been made solely for the benefit of the parties hereto" and "no other person shall acquire or have any right under or by virtue of this Agreement."), plainly do not address the circumstance presented here. Rather, these nonassignability provisions simply beg the essential question, which is whether bioMerieux's subsidiary, by virtue of its acquisition of CBC stock, terminated *CBC's* rights under the cross-licenses. Interpreted as Pasteur proposes, CBC's own rights under the cross-licenses would terminate with *any* change in the identity of any CBC stockholder.

Other cross-license provisions directly undercut Pasteur's interpretation as well. *See Willitts v. Roman Catholic Archbishop of Boston*, 411 Mass. 202, 581 N.E.2d 475, 478 (1991) (noting that a contract must be interpreted as a whole). These cross-licenses explicitly authorize CBC to share its license rights with any "affiliated company," which on its face presumably encompasses a parent corporation such as bioMerieux's subsidiary. Cross-Licenses, at § 1.4 (defining "Affiliated Company" as "an organization which controls ... a party or an organization which is under common control with a party"); *see supra* Section I. Yet more importantly, CBC insisted upon a provision which would afford it the unilateral right to terminate any sublicense Pasteur might extend to a company called Genetic Systems "if control of Genetic Systems shall ... be acquired, directly or

---

**11.** Notwithstanding Pasteur's reliance on the important policy goals animating the federal common law of patents, the product-innovation theme promoted under patent law may well be accommodated by allowing patent holders to control sublicensing *through negotiated contract restrictions.*

indirectly, by any person or group of connected persons or company not having such control at the date hereof, by reconstruction, amalgamation, *acquisition of shares* or assets *or otherwise.*" Royalty–Free Cross–License, at § 2.3 (emphasis added); *see PPG Indus.,* 597 F.2d at 1096 (noting that patent holder's express reservation of change-of-stock-ownership condition in two patent licenses suggested its intention not to reserve condition in nine other patent licenses); *see also Plumbers & Steamfitters Local 150 Pension Fund v. Vertex Constr. Co.,* 932 F.2d 1443, 1449 (11th Cir.1991) ("[T]he doctrine of *expressio unius est exclusio alterius* instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded."). Taken together, these provisions persuade us that Pasteur foresaw, or reasonably should have foreseen, that CBC might undergo changes of stock ownership which would not alter its corporate legal identity, but nonetheless chose not to condition the continued viability of its cross-licenses accordingly.[12]

## III

### CONCLUSION

As CBC remains in all material respects the legal entity with which Pasteur freely contracted, Pasteur has not made the required individualized showing that it is or will be deprived of "the full benefit of [its] bargain," *Leroux,* 69 F.3d at 612–13, under the ruling challenged on appeal. Accordingly,

the district court judgment is affirmed and costs are awarded to appellee.

*So ordered.*

**12.** Lastly, Pasteur misplaces reliance upon *In re Alltech Plastics, Inc.,* 5 U.S.P.Q.2d 1806, 1987 WL 123991 (Bankr.W.D.Tenn.1987), where it was held that section 365(c) precluded an entity, which had acquired the corporate debtor's stock pursuant to a chapter 11 reorganization plan, from exercising the debtor's rights under a prepetition patent license. Following the conversion of its original chapter 11 reorganization case to a chapter 7 liquidation, Alltech discontinued all operations and discharged its employees. Before the debtor once again converted to chapter 11, its trustee liquidated virtually all its assets, except for its patent license. Noting that plan confirmation is a fact-intensive, equity-based inquiry, *id.* 5 U.S.P.Q.2d at 1813, the bankruptcy court characterized the sale of Alltech's stock to Fluoropak Container Corporation as a *de facto* assignment of the patent license to a noncontracting party. It so held because *unlike*

*CBC,* Alltech had ceased to exist except as a "shell." *Id.* at 1807 & 1810 (noting that "shell" emerging after Alltech's chapter 7 conversion "is in reality a different entity than the prepetition Debtor"). The bankruptcy court specifically observed that the "attempted innovative rebirth of a corporate shell is not analogous to a sale of stock by an active corporation," *id.* at 1810–11, and that "the present case is distinguished from one where the reorganizing debtor, operating continuously and in good standing with its licensor, seeks to approve the sale of its stock [to a third party]," *id.* at 1812. The bankruptcy court further noted that the lack of demonstrated expertise on the part of Fluoropak, in utilizing the patented process to manufacture toxic-material containers, likewise posed a serious public safety risk. *Id.* These distinguishing circumstances make *Alltech* inapposite.