In re HEALTHCO INTERNATIONAL,
INC., Debtor,

HICKS, MUSE & CO., INC.,
et al., Appellants,

v.

William A. BRANDT, Jr.,
Trustee, Appellee.

No. 97–1381.

United States Court of Appeals,
First Circuit.

Heard Oct. 7, 1997.

Decided Feb. 12, 1998.

David L. Evans, Boston, MA, with whom Harold B. Murphy, Daniel J. Lyne, D. Ethan Jeffery, Hanify & King, Boston, MA, Mike McKool, Jr., Jeffrey A. Carter and McKool Smith, Dallas, TX, were on brief, for appellants

Daniel C. Cohn, with whom David B. Madoff and Cohn & Kelakos LLP, Boston, MA, were on brief, for appellee.

Before STAHL, Circuit Judge, GODBOLD * and CYR, Senior Circuit Judges.

* Of the Eleventh Circuit, sitting by designation.

CYR, Senior Circuit Judge.

The question presented on appeal is whether the bankruptcy court abused its discretion by approving a settlement between the chapter 7 trustee for Healthco International, Inc. and a consortium of banks ("the Bank Group") which financed a prepetition leveraged buy-out ("LBO") of Healthco by appellants Hicks Muse & Co., Inc. and its coinvestors (collectively: "Hicks Muse"). We affirm.

# I

## BACKGROUND

Appellant Hicks Muse financed the 1991 LBO with a $50 million term loan and a $65 million revolving credit facility from the Bank Group, secured by liens on all Healthco assets. Healthco filed its chapter 11 petition in June 1993 and continued to operate as a debtor-in-possession. Three months later an interim trustee was appointed and the reorganization was converted to a chapter 7 liquidation.

By the time the chapter 7 trustee ("Trustee") was appointed approximately one month later, Healthco's assets already were undergoing liquidation by the interim trustee, subject to bankruptcy court approval. In the chapter 11 schedules the Healthco assets were valued at $149 million, but were later assigned a liquidation value between $33 and $66 million.

After obtaining relief from the automatic stay, see Bankruptcy Code § 362, 11 U.S.C. § 362, the Bank Group proceeded to liquidate its Healthco collateral, having agreed to provide the Trustee with "full, complete, and detailed accounting[s]" of the liquidation on a monthly basis. Over the ensuing year the Trustee lodged several complaints, with the Bank Group and the bankruptcy court, that the promised accountings had not been forthcoming or were deficient. Eventually the

Bank Group submitted a thirty-page accounting pursuant to court order and provided the Trustee with thirty cartons of raw invoices generated during the collateral liquidation process.

After declining to incur "the incredible cost ... of ... go[ing] through the[se] records item by item," the Trustee commenced an adversary proceeding against Hicks Muse and the Bank Group, asserting two principal claims. First, since the LBO had left Healthco insolvent, the Trustee claimed that the $115 million lien obtained by the Bank Group on the Healthco assets constituted a voidable fraudulent transfer (hereinafter: "the fraudulent transfer claim"). See Bankruptcy Code § 544(b), 11 U.S.C. § 544(b). Second, the Trustee claimed that the Bank Group had liquidated its Healthco collateral in a "commercially unreasonable" manner, see Mass. Gen. Laws Ann. ch. 106, § 9–504(3) ("UCC"), which yielded only $50–60 million on assets with an estimated value (per chapter 11 schedules) exceeding $149 million (hereinafter: "the UCC claim").

The Trustee subsequently proposed to dismiss both the fraudulent transfer claim and the UCC claim, see Fed. R. Bankr.P. 9019(a);[1] see also Fed. R. Bankr.P. 9014 (contested matters), in return for the Bank Group's agreement to pay the chapter 7 estate $9 million in cash, waive roughly $1 million in allowed priority claims against the chapter 7 estate and a deficiency claim estimated at $35 million, and assign to the Trustee any LBO-related claims the Bank Group might have against third parties, including nonsettling defendants in the adversary proceeding.[2] The Trustee in turn agreed not to oppose the $50–60 million secured claim asserted by the Bank Group against the Healthco collateral. Several codefendants, including Hicks Muse, objected to the settlement.

---

1. Bankruptcy Rule 9019(a) provides: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."

2. Initially the Trustee proposed that the Bank Group assign its deficiency claim to the Trustee, but the bankruptcy court disapproved the assign-

ment as inconsistent with the Trustee's fiduciary obligation to unsecured creditors. The court nonetheless concluded that an outright waiver of the deficiency claim would be permissible. As appellants do not challenge the bankruptcy court ruling in the latter respect, we do not address it.

At the hearing before the bankruptcy court, the Trustee contended that the proposed $45 million settlement would serve the "best interests" of the chapter 7 estate, *see* Kowal v. Malkemus (*In re Thompson*), 965 F.2d 1136, 1141 n. 5, 1145 (1st Cir.1992), for two reasons. First, the Trustee pointed out that the $45 million offer would return the chapter 7 estate ninety percent of the $50 million estimated maximum litigated value of the fraudulent transfer claim, without litigation risk. Second, the Trustee noted several factors central to his assessment that the UCC claim, fully litigated, could generate only minimal value for the chapter 7 estate. *See infra* Section II.B.1. The bankruptcy court approved the proposed settlement with one pertinent modification.[3]

On intermediate appeal to the district court, Hicks Muse challenged the bankruptcy court finding that the settlement between the Trustee and the Bank Group had been negotiated in "good faith." The district court ruled the "good faith" test immaterial under the "best interests" standard applicable under Bankruptcy Rule 9019, and opined that a finding of "good faith" might be misperceived by state courts as a basis for barring Hicks Muse from pursuing its state-law contribution claim against the Bank Group. In all other respects the bankruptcy court order was affirmed by the district court.

## II

### DISCUSSION

#### A. *Appellate Jurisdiction*

The Trustee contends that the appeal is moot because Hicks Muse knowingly disregarded his warning that the settlement would be consummated promptly absent a timeous stay of the bankruptcy court order approving the settlement. As Hicks Muse sought no stay, the Bank Group promptly disbursed $9 million to the Trustee, from which $2.5 million has since been used to defray professional fees. Thereafter, all claims in the adversary proceeding against the Bank Group were dismissed with prejudice.

#### 1. *Equitable Mootness*

■ The "equitable mootness" doctrine imports both "equitable" and "pragmatic" limitations upon our appellate jurisdiction over bankruptcy appeals. *See Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.*), 104 F.3d 489, 492 n. 5 (1st Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 2511, 138 L.Ed.2d 1014 (1997); *Rochman v. Northeast Utils. Serv. Group (In re Public Serv. Co. of N.H.*), 963 F.2d 469, 471 (1st Cir.1992).

■ The "equitable" mootness test inquires whether an unwarranted or repeated failure to request a stay enabled developments to evolve in reliance on the bankruptcy court order to the degree that their remediation has become impracticable or impossible. *Id.* at 472. In the instant case, however, Hicks Muse neither repeatedly ignored its right, nor significantly delayed utilizing its opportunities, to seek a stay of the order approving the Bank Group settlement. *Cf. id.* at 472–73 (noting that appellants ignored several opportunities to take interlocutory appeals from orders denying stays during sixteen-month period following confirmation of reorganization plan).

■ Nor has the Trustee met the "pragmatic" mootness test, which contemplates proof that the challenged bankruptcy court order has been implemented to the degree that meaningful appellate relief is no longer practicable even though the appellant may have sought a stay with all due diligence. Instead, the Trustee relies either upon more finely focused reorganization provisions not applicable here, *see* Bankruptcy Code § 1127(b), 11 U.S.C. § 1127(b) (barring plan modification after "substantial consummation"), or inapposite settlement provisions pursuant to which lawsuits in nonbankruptcy

---

**3.** The court expressly refrained from determining the validity *vel non* of the Bank Group's purported assignment to the Trustee of its causes of action against nonsettling codefendants. For post-settlement procedural developments in this adversary proceeding, see *In re Healthco Int'l,* Inc., 208 B.R. 288 (Bankr.D.Mass.1997); *In re Healthco,* 203 B.R. 515 (Bankr.D.Mass.1996); *In re Healthco,* 201 B.R. 19 (Bankr.D.Mass.1996); *In re Healthco,* 195 B.R. 971 (Bankr.D.Mass. 1996).

courts had already been dismissed with prejudice, or substantial distributions had been made to parties no longer amenable to bankruptcy court jurisdiction. Here, of course, the only dismissal with prejudice occurred in the instant adversary proceeding and there has been no showing that any portion of the settlement proceeds disbursed to the Trustee, or to persons employed by the Trustee, could not be recovered with relative ease. *See In re The Gibbons–Grable Co.,* 141 B.R. 614, 617 (Bankr.N.D.Ohio 1992) (noting that interim disbursements of compensation under Bankruptcy Code sections 330 and 331 remain subject to reconsideration); *see also In re Spillane,* 884 F.2d 642, 644 (1st Cir. 1989).

Accordingly, the equitable mootness doctrine does not bar the present appeal.

### 2. *Section 363(m) Mootness*

■ The Trustee further contends that the appeal is mooted by section 363(m), which states:

The reversal or modification on appeal of an *authorization* under [§ 363(b) or (c) ] *of a sale or lease of property* [of the estate] does not affect the validity of a *sale or lease* under such authorization *to an entity that purchased or leased such property* in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such *sale or lease* were stayed pending appeal.

Bankruptcy Code § 363(m), 11 U.S.C. § 363(m) (emphasis added). The Trustee argues that section 363(m) applies because the claims which were settled with the Bank Group constituted "property of the estate," *see* Bankruptcy Code § 541(a), 11 U.S.C. § 541(a), and therefore the settlement was the functional equivalent of a "sale ... of property" of the estate under section 363(m). The Trustee's contention is fraught with problems.

First, it is at odds with the unambiguous language employed in section 363(m). *See Laracuente v. Chase Manhattan Bank,* 891 F.2d 17, 22 n. 2, 23 (1st Cir.1989) (in construing Bankruptcy Code, "our inquiry ... ends where, as here, the plain language of the statute is unambiguous"). By its very nature

a settlement resolves adversarial claims *prior* to their definitive determination by the court. In contrast, a "sale" effects a "[t]ransfer of ['the title ...'] [to] property for [a] consideration...." Black's Law Dictionary 1200 (5th ed.1979). The bankruptcy court below simply endorsed a settlement negotiated by the adversaries whereby the Trustee abandoned claims against the Bank Group in return for a prescribed consideration.

Second, the interpretation urged by the Trustee is not in step with the legislative policy animating section 363(m), which sought to encourage optimum bids for "property of the estate" from entities not otherwise privy to the bankruptcy proceedings, by ensuring that orders approving such sales promptly become final absent a timeous stay. *See Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs.* (*In re Mark Bell Furniture Warehouse, Inc.*), 992 F.2d 7, 8 (1st Cir.1993); *Willemain v. Kivitz,* 764 F.2d 1019, 1023 (4th Cir.1985) (defining "good faith purchaser" as " 'one who purchases the assets for value, in good faith, and without notice of adverse claims' ") (citation omitted); *Greylock Glen Corp. v. Community Sav. Bank,* 656 F.2d 1, 4 (1st Cir.1981). By contrast, the Bank Group in no sense qualified as an outside bidder eligible for the extraordinary "finality" guaranties afforded by section 363(m). Instead, as the defendant directly targeted by the Trustee in the subject adversary proceeding, not only was the Bank Group the one "bidder" at all concerned about resolving the disputed claims asserted against it by the Trustee, but it lacked any incentive to abandon its settlement bargain with the Trustee even absent the extraordinary "finality" guaranties envisioned in section 363(m).

■ Finally, the authorities cited by the Trustee are inapposite or inconclusive at best. *See, e.g., In re Telesphere Communications, Inc.,* 179 B.R. 544 (Bankr.N.D.Ill. 1994). *Telesphere* suggests no broad functional equivalence between a property sale or lease and a settlement, but simply that courts may consult section 363 for *guidance* in identifying standards for such basic procedures as "notice" and "hearing," *id.* at 552

(citing 11 U.S.C. § 363(b)), particularly since no substantive Code provision directly governs settlement approvals by the bankruptcy court, *compare* Fed. R. Bankr. 9019 (prescribing procedural guidance for settlements), *with* Fed. R. Bankr.P. 6004 (prescribing distinct procedural rules for § 363 sales). For that matter, *Telesphere* did not so much as mention section 363(m), let alone endorse its wholesale importation into the settlement arena.[4]

## B. *The UCC Claim Settlement* [5]

 Hicks Muse maintains that the bankruptcy court abused its discretion in approving the UCC claim settlement absent an adequate factual foundation for determining the value of the UCC claim because the Trustee never reviewed the thirty cartons of invoices generated by the Bank Group during its collateral liquidation. *See supra* Section I; *see also, e.g., In re Goldstein*, 131 B.R. 367, 371 (Bankr.S.D.Ohio 1991) (disapproving settlement because trustee made no "thorough review of the underlying documents [a trust and will] and applicable law").

 The bankruptcy court essentially is expected to "'assess[ ] and balance the value of the claim[s] ... being compromised against the value ... of the compromise proposal.'" *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir.1995) (citation omitted). It may consider, among other factors: (1) the probability of success were the claim to be litigated—given the legal and evidentiary obstacles and the expense, inconvenience and delay entailed in its litigation—measured against the more definitive, concrete and immediate benefits attending the proposed settlement, *see Kowal*, 965 F.2d at 1141 n. 5, 1145 (so-called "best interests" standard); (2) a reasonable accommodation of the creditors' views regarding the proposed settlement; and (3) the experience and competence of the fiduciary proposing the settlement. *See Jeffrey*, 70 F.3d at 185; *In re Texaco, Inc.*, 84 B.R. 893, 902 (Bankr.S.D.N.Y.1988) (citing *Protective Committee for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968)).

### 1. *"Best Interests"*

 The Trustee identified several reasons for settling the UCC claim for minimal value.[6] First, the estate would face a formi-

---

**4.** Nevertheless, there lurks a concern, not raised here, which may cut the other way. Prior to the Bankruptcy Code, sales of property belonging to the estate were governed by Bankruptcy Act § 70(f), 11 U.S.C. § 110 (repealed), and settlements were subject to Bankruptcy Act § 27, 11 U.S.C. § 50 (repealed). *See* 9 Lawrence P. King, *Collier on Bankruptcy* ¶ 9019.RH, at 9019–12 (15th ed.1995). Former Bankruptcy Rule 919, predecessor to Bankruptcy Rule 9019, was the procedural counterpart to Bankruptcy Act § 27, whose substantive provisions have not been carried forward in the Bankruptcy Code. *See In re Dow Corning Corp.*, 198 B.R. 214, 244–47 (Bankr.E.D.Mich.1996); *In re Sparks*, 190 B.R. 842, 843–44 (Bankr.N.D.Ill.1996). Moreover, the legislative history relating to the repeal of Bankruptcy Act § 27 affords no insight to the intent behind this discontinuity.

Although Bankruptcy Rule 9019 purports to empower the bankruptcy court to approve settlements, it may not "abridge, enlarge, or modify any *substantive* right [enacted in the Code]." 28 U.S.C. § 2075 (emphasis added). Thus, absent some clear Code source for the substantive power to approve settlements, one may question whether Congress envisioned section 363 as that source, *but see Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 n. 4 (9th Cir. 1986) (suggesting, in dicta, that Congress may have intended the general equitable powers prescribed in Code § 105 to subsume the specific powers described in Bankruptcy Act § 27), or whether the power to approve settlements is simply inherent to the judicial forum.

As in any other case, we must consider, *sua sponte* if need be, whether we possess subject matter jurisdiction over an appeal. *See Lopez v. Unanue Casal (In re Unanue Casal)*, 998 F.2d 28, 30 (1st Cir.1993). Nonetheless, we may bypass problematic jurisdictional questions if it appears that the appeal must in all events fail on the merits. *See Institut Pasteur*, 104 F.3d at 492. As this is such a case, we proceed to the merits.

**5.** Bankruptcy court orders endorsing settlements are reviewed for manifest abuse of discretion. *See Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir.1995). Moreover, "[t]he [bankruptcy] judge ... is not to substitute her judgment for that of the trustee, and the trustee's judgment is to be accorded some deference." *Hill v. Burdick (In re Moorehead Corp.)*, 208 B.R. 87, 89 (1st Cir.BAP 1997). "Compromises are favored in bankruptcy." 9 *Collier on Bankruptcy* ¶ 9019.01, at 9019–2.

**6.** On the other hand, Hicks Muse offered no solid evidentiary basis for second-guessing the Trustee's assessment that the settlement recoveries would amount to 90% of the total allegedly due the estate on the fraudulent transfer claim.

dable burden in attempting to demonstrate that the Bank Group liquidated its collateral in a "commercially unreasonable" manner. Second, Hicks makes too much of the Trustee's decision to forego a costly and time-consuming lapidarian review of every invoice generated during the collateral liquidation, especially since Hicks makes no suggestion that the individual invoices reflect any relevant information other than the price obtained. Ordinarily a UCC § 9–504(3) claimant must show something besides a low price, as by demonstrating that the collateral liquidation was not *conducted* in a commercially reasonable manner. *See* Mass. Gen. Laws Ann. ch. 106, § 9–507(2); *RTC v. Carr*, 13 F.3d 425, 429–30 (1st Cir.1993) (citing *Chartrand v. Newton Trust Co.*, 296 Mass. 317, 5 N.E.2d 421, 423 (1936)); *Nadler v. Baybank Merrimack Valley, N.A.*, 733 F.2d 182, 184 (1st Cir.1984). Thus, absent extraordinary circumstances not present here, mere evidence that the Healthco collateral might have returned more than $50 million in some exquisitely orchestrated liquidation did not offset the substantial burdens and risks which the Trustee would have encountered in litigating the UCC claim.

 Furthermore, the insistence by Hicks Muse that the Trustee review every invoice in the thirty cartons delivered by the Bank Group is predicated on the mistaken notion that the Trustee or the bankruptcy court was obliged to fix the value of the UCC claim with near mathematical precision before it could be settled. *See Kowal*, 965 F.2d at 1145 ("[A] chapter 7 trustee ... realistically cannot be required to demonstrate to the satisfaction of every individual creditor and the debtor, or to any compelling degree of certitude, that the settlement benefit to the chapter 7 estate and the value of the settled claim comprise a matched set."). Among other practical considerations overlooked under this approach is the reality that many, if not most, claims settled in bankruptcy proceedings are not amenable either to ready or exact valuation in the abstract. *In re Energy Coop.*, 886 F.2d 921, 929 (7th

Cir.1989) (" '[A]n exact judicial determination of the values in issue would defeat the purpose of compromising the claim.' ") (citation omitted); *In re Lee Way Holding Co.*, 120 B.R. 881, 897 (Bankr.S.D.Ohio 1990) (noting that settling party need only have "[f]amiliarity with a case, its factual patterns, legal theories, and evidence," and need not be "so familiar with the case as to be prepared for trial"). Thus, "th[e] responsibility of the bankruptcy judge, and ours on review, is not to decide the numerous questions of law and fact raised by appellants but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.' " *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir.1983) (citation omitted); *see In re Energy Coop.*, 886 F.2d at 929.[7]

The evidence on sale-price insufficiency was highly suspect as well. The original complaint valued the UCC claim at $99 million or more (*i.e.*, $149 million minimum asset value, less $50 million in sale proceeds generated to date). The Trustee quite reasonably attributed its overestimation to aggressive pleading typical of plaintiffs generally at early stages in the proceedings. Moreover, it is often a practical necessity for fiduciaries and claimants in bankruptcy proceedings to utilize the inflated asset values listed in the debtor's schedules as a main source for their valuation estimates prior to any opportunity to conduct discovery, *see* Fed. R. Bankr.P. 7026 (discovery) & 7015 (permitting post-discovery amendments to complaints in adversary proceedings). *See Associates Commercial Corp. v. A & A Transp., Inc. (In re A & A Transp., Inc.)*, 10 B.R. 867, 868–69 (Bankr.D.Mass.1981) ("[A]lthough the Debtor signs the schedules under oath, the values listed therein are only reasonable estimates, and very often the person charged with preparing the schedules has little or no knowledge about the value of certain types of property listed therein."). Fairly early on, in fact, the Trustee uncovered evidence that the

---

7. We reject the contention that the bankruptcy court necessarily considered the UCC claim valueless. Since the evidence did not compel a finding that $45 million was the minimum needed to settle the fraudulent transfer claim, *see supra* note 6, some unidentified portion of the settlement sum may have reflected a reasonable discounting of the UCC claim.

$149 million valuation estimate was grossly excessive.

At a hearing conducted during the chapter 11 proceedings, Healthco personnel pegged the likely collateral liquidation value at between $33 and 66 million, which quite accurately presaged the $50–60 million ultimately generated in sale proceeds. *See In re Tennessee Chem. Co.,* 143 B.R. 468, 475 (Bankr. E.D.Tenn.1992) ("[T]he usual assumption [is] that going concern value is greater than forced sale, liquidation, or salvage value."). Furthermore, for some time Healthco had utilized a deficient inventory control system which may well have caused gross overstatements in its 1993 inventories.

Yet more importantly, however, Healthco was the largest distributor of dental supplies in the United States, with extensive worldwide markets. Its huge market share and the necessity that its inventories virtually be "dumped" on the market reasonably could be expected to cause significantly depressed prices. Moreover, many Healthco accounts receivable were in serious dispute and unlikely to attract substantial offers from third parties. *See, e.g., Brown v. Riley & Power Mgt., Inc. (In re Omni Mech. Contractors, Inc.),* 114 B.R. 518, 522 (Bankr.E.D.Tenn. 1990) ("The value of accounts receivable may be discounted for uncollectible and disputed debts."). Hicks Muse cites no record evidence which would undermine these considerations.[8]

Finally, the Trustee reasonably concluded that even if the sale proceeds obtained by the Bank Group were shown to have been low, it was most unlikely that it could have been demonstrated that the collateral liquidation had been conducted in a commercially unreasonable manner, given that it had begun in 1993 *on terms and conditions approved by the bankruptcy court.* Although close bankruptcy court oversight did not necessarily rule out a claim that the Bank Group unilaterally and "unreasonably" exceeded or disregarded the terms and conditions of the collateral liquidation, Hicks Muse cites no record

evidence that the Bank Group did so. Accordingly, we conclude that the "best interests" factor favored the settlement.

### 2. *Creditor Views*

The unsecured creditors committee strongly supported the proposed settlement, as did the overwhelming majority of individual unsecured creditors. *See Lee Way Holding Co.,* 120 B.R. at 904 (noting importance of creditors committee support for settlement). The only objections came from some noncreditors and nonsettling creditors who were codefendants in the adversary proceeding. Hicks Muse counters that creditors committee support for the original settlement proposal must be discounted because the settlement underwent modification before gaining bankruptcy court approval. Be that as it may, there is no indication that any creditor withdrew its consent based on the *de minimis* modifications subsequently made by the bankruptcy court, none of which detracted from the overall reasonableness of the compromise.

### 3. *The Trustee's Competence and Experience*

Other than by implication, through reliance on the Trustee's reasonable decision not to review the thirty cartons of individual invoices, *see supra* Section II.B.1., Hicks Muse has not questioned the Trustee's professional competence or experience. Absent such a challenge, this factor provided further support for the settlement. *See Hill v. Burdick (In re Moorehead Corp.),* 208 B.R. 87, 89 (1st Cir.B.A.P.1997).

We therefore conclude that Hicks Muse has not demonstrated a manifest abuse of discretion by the bankruptcy court.

### C. *Other Settlement Terms*

#### 1. *Assignment Clause*

▮ Next, Hicks Muse contests a settlement modification which deferred any determination regarding the enforceability of

---

**8.** As the Healthco collateral liquidation was exceptional in these important respects, the Trustee supportably concluded that the decision by the Bank Group not to obtain a liquidation-value appraisal prior to its collateral liquidation was not unreasonable, or at the very least that the trier of fact at trial could have found it excusable.

certain causes of action against nonsettling defendants, including Hicks Muse, which the Bank Group assigned to the Trustee. Hicks Muse contends that the bankruptcy court had no choice but to strike this modification because it lacked the power to approve the assignment. *See Caplin v. Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416, 434, 92 S.Ct. 1678, 1688, 32 L.Ed.2d 195 (1972) (holding that trustee lacked standing to sue in behalf of individual creditors of estate); *Williams v. California 1st Bank*, 859 F.2d 664, 666–67 (9th Cir.1988) (applying *Caplin* ban even though creditor purportedly assigned its claim to trustee).

We need not address the *Caplin* question on which the Hicks Muse contention is predicated. Unlike a settlement agreement wherein the estate abandons an enforceable right, the assignment by the Bank Group conferred a benefit upon the chapter 7 estate. As the bankruptcy court acted well within its discretion in determining that the benefit conferred by the settlement served the "best interests" of the chapter 7 estate without regard to whether the Trustee realized additional benefit from the subject assignment, nothing more was required.[9]

### 2. *Potential Contribution Claims*

 Finally, Hicks Muse faults the bankruptcy court finding that the Trustee and the Bank Group negotiated the settlement in "good faith." It characterizes the finding as immaterial to the Rule 9019(a) "best interests of the estate" standard and worries that the Bank Group may misuse the finding should Hicks Muse later seek contribution, since state law normally bars nonsettling defendants from asserting claims for contribution against codefendants who have settled

with the plaintiff in "good faith." *See, e.g.*, Mass. Gen. Laws Ann. ch. 231B, § 4 (Contribution Among Tortfeasors Act).

The district court attempted to accommodate the Hicks Muse concern by amending the settlement order so as to reserve the question whether the bankruptcy court's "good faith" finding would be entitled to preclusive effect in any subsequent state-law contribution action. Although we concur in the district court's action, we think Hicks Muse was entitled to a determination that the interpretation feared by Hicks Muse is precluded by the settlement order.

The "best interests" standard under Bankruptcy Rule 9019 contemplates a determination by the bankruptcy court as to whether the proposed settlement was negotiated in good faith. *See, e.g., In re Kuhns*, 101 B.R. 243, 246–47 (Bankr.D.Mont.1989) (disapproving "bad faith" settlement). Although the "good faith" finding by the bankruptcy court below was expressed in general terms, without mentioning contribution, elsewhere the court explicitly provided that the legal effect of the settlement order on contribution claims was to be governed by "[n]onbankruptcy law."

Moreover, there is considerable question whether the bankruptcy court possessed the power to make a "good faith" finding preempting future contribution claims by nonsettling parties in these circumstances. *Compare, e.g., Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 752–54 (5th Cir.1995) (holding that bankruptcy court approving settlement lacked jurisdiction to resolve claims between nondebtors), *with Munford v. Munford, Inc. (In re Munford, Inc.)*, 97 F.3d 449, 455 (11th Cir.1996) (holding that Bankruptcy Code § 105 may empower bankruptcy court to bar future contribution claims by nonsettling defendants). In all events, since

---

**9.** Hicks Muse cites no apposite authority for its view that the bankruptcy court had to determine the enforceability *vel non* of the assignment before approving the settlement agreement under Rule 9019(a), particularly since the *Caplin–Williams* issue remained unripe for adjudication unless and until the Trustee were to assert an assigned claim against Hicks Muse.

Furthermore, though we need not resolve the matter, it seems unlikely that Hicks Muse could demonstrate cognizable injury. The Bank Group (and its putative assignee) would have had to

assert—in the adversary proceeding, *see* Fed. R. Bankr.P. 7013—whatever LBO-related claims it held against Hicks Muse. Whereas the Trustee notes that he elected not to assert any derivative claim against Hicks Muse at trial in the adversary proceeding. *See MAI Systs. Corp. v. C.U. Techs., Inc. (In re MAI Systs. Corp.)*, 178 B.R. 50, 55 (Bankr.D.Del.1995) (*res judicata* normally bars subsequent litigation of claim which could have been litigated in earlier contested matter or adversary proceeding).

the Trustee did not request extraordinary equitable relief under Bankruptcy Code § 105, *cf. supra* Section II.C.1 (bankruptcy court need not determine enforceability of settlement terms which pose no detriment to chapter 7 estate), we need not resolve this question. Absent any clear indication that future contribution claims were foreclosed, we conclude that the bankruptcy court discussed "good faith" simply as another factor in its "best interests" analysis, *see In re Kuhns,* 101 B.R. at 246–47, rather than with a view to barring or otherwise affecting future contribution claims.

Accordingly, should Hicks Muse subsequently assert a state-law contribution claim against the Bank Group, it is to be governed by the applicable state law. If the applicable state law were to comport with the "good faith" standard under Bankruptcy Rule 9019, the Bank Group might prevail on its contention that the settlement order collaterally estops Hicks Muse from relitigating the factual issue as to whether the settlement between the Trustee and the Bankruptcy Group was negotiated in good faith. As there may be no necessary equivalence between Bankruptcy Rule 9019 and applicable nonbankruptcy contribution law regarding the governing "good faith" standard, we venture no opinion.

*Affirmed.*