van Gestel, J.
This case comes before the Court on the motion to dismiss of the defendant Pasteur Sanofi Diagnostics (“Pasteur”). Pasteur relies upon Mass.R.Civ.P. Rule 12(b)(2), (3) and (6). For the reasons stated below, this Court ALLOWS Pasteur’s motion trader Rule 12(b)(3)[1] on grounds relating to improper venue.
BACKGROUND
The complaint is quite lengthy, covering 27 pages, including 99 paragraphs of allegations and naming five separate, mostly unrelated defendants. The motion trader consideration, however, involves only the defendant Pasteur.
In brief, the relevant portions of the complaint reveal that the plaintiff Cambridge Biotech Corporation (“CBC”) once operated a business that consisted primarily of the manufacture, marketing and sale of retroviral diagnostic products. CBC, in its business, used, in part, patented technology licensed to it by Pasteur (referred to herein as the “Pasteur licenses”). There are two Pasteur licenses, each containing essentially identical nonassignment provisions and forum selection clauses. These provisions and clauses are at the heart of the issues now before the Court.
The other plaintiff is Cambridge Affiliate Corporation (“CAC”). CAC was organized by CBC for the sole purpose of contracting with Cambridge Diagnostics Ireland Ltd. (“CDIL") to manufacture and market retro-viral diagnostic products for detecting HIV viruses using, in part, the technology in the Pasteur licenses.
CBC owns 51% of the common stock of CAC, and another defendant, Selfcare, Inc. (“Selfcare”), owns 49% thereof. This stock ownership of CAC enables it to be considered an “affiliate” of CBC to which CBC could extend the benefits of the Pasteur licenses.
Pursuant to the Pasteur licenses, which are cross-license agreements, each of CBC and Pasteur acquired nonexclusive perpetual licenses to certain technology patented or licensed by the other.
The Pasteur licenses broadly prohibit the licensees from assigning or sublicensing the rights or benefits of the licenses to others without the prior written consent of all parties. There is an exception to the nonassignability provisions in that a party to the licenses may extend to its “affiliated” companies the benefits of the licenses. An affiliated company is defined as “an organization which controls or is controlled by a party or an organization which is under common control with a party . . .” Control is said to mean direct or indirect legal or beneficial ownership of 51% or more of the voting stock.
In 1994, CBC filed a petition for reorganization under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court in Worcester. CBC remained a debtor-in-possession of its business under the supervision of the Bankruptcy Court until its emergence in 1996.
On November 23, 1994, CBC, CBIL and Selfcare entered into certain agreements (the “Selfcare agreements”) whereby Selfcare purchased the stock of CBI1, CBC granted the rights to the benefits of the Pasteur licenses to CAC, and CBC sold 49% of the stock in CAC to Selfcare. The Bankruptcy Court approved these transactions, and it is alleged that Pasteur consented to them.
The Selfcare agreements were intended to transfer the ownership of CBIL to Selfcare in a maimer that would allow CDIL to act for CAC in the manufacturing of retroviral diagnostic products utilizing the patented technology licensed to CBC by Pasteur.
On July 18, 1996 the Bankruptcy Court issued an order confirming CBC’s plan for reorganization. Included in the order was approval of the assumption by CBC of the Pasteur license agreements and the Self-care agreements relating to the purchase of CBIL and 49% of the stock of CAC. The Bankruptcy Court’s order was challenged by Pasteur and upheld on appeal in a case entitled Institut Pasteur v. Cambridge Biotech Corporation, 104 F.3d 489 (1st Cir. 1997).
In October 1998, CDIL, now completely owned by Selfcare, advised CBC that on September 30 of that year it had assigned to Trinity Biotech, pic, (“Trinity”), another defendant herein, licenses, other than the Pasteur licenses, that CBC had previously granted to CBIL. Further, CBC later learned that contracts were signed on behalf of CAC by yet another defendant, Ronald Zwanziger, then CAC’s president, making Trinity the manufacturing and sales agent for CAC, and thus permitting Trinity to use the Pasteur licenses’ rights in such manufacturing.
CBC has claimed that these actions, purportedly on behalf of CAC, are in violation of the original Selfcare agreements approved by the Bankruptcy Court.[2] CBC *278 is now attempting, thus far unsuccessfully, to have those actions declared null and void.
Pasteur, claiming the CAC transaction with Trinity to be an unauthorized assignment of its patented technology contrary to the non-assignment provision in the Pasteur licenses, has purported to terminate CBC’s and CAC’s rights effective January 27, 1999.
This case was filed on January 20, 1999, and included an effort by CBC and CAC to preliminarily enjoin Pasteur from terminating the Pasteur licenses. The preliminary injunction was denied by Judge Gants on January 28, 1999. See Findings of Fact and Conclusions of Law on Plaintiffs’ Motion for Preliminary Injunction. Familiarfiy with Judge Gants’s extensive and thoughtful findings and conclusions is presumed.
Each of the Pasteur licenses contains the following provision:
Should any controversy exist or arise under the present Agreement, it is herewith agreed that the parties shall bring it before the courts in the country of the respective defendant.
DISCUSSION
In assessing a motion to dismiss, the Court must accept as true all of the allegations of the complaint and all reasonable inferences which may be drawn from the complaint and which are favorable to the parly whose claims are challenged. Hahren v. Brown, 46 Mass.App.Ct. 793, 795 (1999). See also Spinner v. Nutt, 417 Mass. 549, 550 (1994); Logotheti v. Gordon, 414 Mass. 308, 310-11 (1993).
There is nothing stated in the complaint, or from which anything can be inferred, to the effect that the forum selection clauses in the Pasteur licenses are ambiguous, invalid, were induced by fraud, were the product of mistake or misunderstanding or are otherwise not the rational agreement of the parties to the licenses. Indeed, CBC and CAC make only one oblique reference about the effect of the forum selection clauses in Paragraph 65 of their complaint.
In Jacobson v. Mailboxes, Etc. U.S.A., Inc., 419 Mass. 572, 575 (1995), the Supreme Judicial Court accepted “the modern view that forum selection clauses are to be enforced if it is fair and reasonable to do so.” The SJC followed that statement with a reference to the Restatement (Second) of Conflict of Laws, Sec. 80 (1988 revision). Comment c to Sec. 80 reads:
A court will entertain an action brought in violation of a choice-of-forum provision if it finds that the provision was obtained by fraud, duress, the abuse of economic power or other unconscionable means. Relevant in this connection, but not itself controlling, would be the fact that the provision was contained in an adhesion or take-it-or-leave-it contract whose provisions the party bringing the action was compelled to accept without argument or discussion.
There is nothing in the complaint alleging, nor have the plaintiffs argued, that the forum selection clauses in issue were obtained by fraud, duress, the abuse of economic power or any other unconscionable means. The parties to the Pasteur licenses were sophisticated and knowledgeable business enterprises. There is nothing to suggest, nor is it argued, that one took advantage of the other. Nor can it be said that the Pasteur license agreements are contracts of adhesion.[3]
The plaintiffs argue here that the forum selection clauses should not be enforced because they are not fair or reasonable. To accept this contention, this Court must first come to the conclusion — which it refuses to do — that France is in some way a backward nation, with an inadequate judicial system. Next, this Court must conclude that CBC — which the plaintiffs’ Memorandum of Law in Opposition to Pasteur Sanofi’s Motion to Dismiss tells this Court has been, since 1996, owned by bioMerieux Inc., the latter being “wholly owned by bioMerieux, S.A., a French biotechnology company that competes with Pasteur Sanofi"— would be disadvantaged by litigating in a French court. Again, this Court can find no disadvantage here.
Cross-affidavits on French law have been submitted by the parties. This Court finds the position of the affidavits of Professor Lesguillons, a Professor of International Law at the University of Paris, and Professor Lowenfeld, a Professor of International Law at New York University, to be more compelling in their analysis than that of Professor Watt, also a Professor of International Law at the University of Paris.[4] The former opine, with amply supported reasoning, that: (1) a French court would accept jurisdiction over this dispute as required by the forum selection clauses; (2) a French court would accept the choice of Massachusetts law provision found elsewhere in the license agreements and could apply that law in a reasonable and just way; (3) a French court could apply and interpret the Bankruptcy Court orders in a reasonable and just way; and (4) if a Massachusetts court applied a forum non conveniens theory and held on to this case, its decision would not be enforceable in France.
Professor Watt expresses “concern” in her affidavit; although she makes the point that it is beyond her own competence to characterize her reasons under the criteria laid down in cases such as The Bremen v. Zapata Offshore Co., 407 U.S. 15 (1972),or to say whether they would lead a Massachusetts court to refuse to uphold the parties’ choice of jurisdiction.
Professor Watt’s “concerns” revolve primarily around the ability of a French court to interpret the orders of the Bankruptcy Court. In this regard she seems almost to assume that the Bankruptcy Court and the Superior Court are in some way related, or at least that this Court has some ability not available to *279 a French court to derive the meaning and reach of the Bankruptcy Court’s orders.
More significantly, Professor Watt appears to accept CBC’s and CAC’s contention that their lawsuit is not about or does not arise from the Pasteur license agreements but rather is about enforcing the Bankruptcy Court’s orders. This Court disagrees, at least insofar as the dispute between Pasteur and CBC and CAC is concerned.
An examination of the complaint reveals only three of the eight counts as involving or naming Pasteur; and those three are directed at Pasteur alone. Count II seeks declaratory and injunctive relief regarding Pasteur’s rights to terminate the licenses (Paragraphs 61-67). Count VII charges Pasteur with tortious interference with present and future economic relations by the termination of the Pasteur licenses (Paragraphs 91-94). Count VIII claims violations by Pasteur of G.L.c. 93A by wrongfully terminating the licenses without a valid basis (Paragraph 96). To suggest that these three counts do not present controversies that exist or arise under the license agreements is a leap far beyond any that this Court is prepared to take.[5]
ORDER
For the reasons set forth in this Memorandum, the Motion to Dismiss of Pasteur Sanofi Diagnostics, on Rule 12(b)(3) grounds of improper venue, is ALLOWED.
Further, this Court determines that there is no just reason for delay and, therefore, expressly directs the entry of an appropriate judgment. See Mass.R.Civ.P. Rule 54(b).

 Although the license agreements at issue and affidavits of legal experts have been submitted and considered by the Court in connection with this motion, since the issues relied upon are solely legal and the agreements are referenced and discussed in the complaint, it does not seem necessary to convert this motion, at least the part under Rule 12(b)(3), from a motion to dismiss to a motion for summary judgment. See, e.g., Watros v. Greater Lynn Mental Health, etc., 421 Mass. 106, 108-09 (1995); Stop & Shop Companies v. Fisher, 387 Mass. 889, 992 (1983); Harhen v. Brown, 46 Mass.App.Ct. 793, 798 n.5 (1999).

 CBC has also taken a completely contradictory position— not accepted by this Court — that the Bankruptcy Court effectively approved the Trinity transactions, and thus they are fully valid and not in violation of the nonassignability provisions of the Pasteur licenses. See, e.g., n.5 infra.

 It does not pass unnoticed that CBC, when in the protection of the Bankruptcy Court, chose — and that court approved its choice — to assume the Pasteur licenses, complete with the forum selection clauses intact. See complaint, Paragraph 59.

 This Court is of the opinion that the legal debate is of minimal significance. What counts most is the agreement of sophisticated parties to the forum selection clauses. It was at the time of agreement, or at least at the time of thf assumption of the licenses while in the cocoon of bankruptcy, that CBC and CAC ought to have resisted because of the now-perceived deficiencies of French law.

 It is the CDIL transaction with Trinity on which Pasteur grounds its termination of the licenses. This transaction occurred well after CBC emerged from bankruptcy and was not —as indeed, it could not have been — sanctioned by the Bankruptcy Court in its approval of the plan of reorganization. Even the Bankruptcy Court’s actions regarding the earlier Selfcare agreements can hardly be said to constitute approvals of the transfer of technology as assignments under the licenses. The First Circuit made it quite clear that the sale of stock in CDIL did not change the entity, only its stock ownership, and therefore there was no assignment. See Institut Pasteur v. Cambridge Biotech Corporation, supra, 104 F.3d at 494-95. That decision cannot be said to provide validation for the transaction with Trinity. The latter transaction, in addition to occurring after the Chapter 11 proceedings were concluded, has not been presented as a mere change in stock ownership.