**In re HIGH VOLTAGE ENGINEERING CORPORATION, et al.**

**Civil Action No. 08–12141–JLT.**

United States District Court,
D. Massachusetts.

April 14, 2009.

Paula R.C. Bachtell, Department of Justice, Boston, MA, for John Fitzgerald Office of Trustee.

Jan A. Brody, Jeffrey A. Cooper, Marc D. Miceli, Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, Roseland, NJ, Gilbert F. Whittemore, Rath, Young and Pignatelli, PA, Boston, MA, for Mellen Pride Sales Company, Inc.

G. Mark Edgarton, Jean–Paul Jaillet, John F. Ventola, Eleanor P. Williams, Choate, Hall & Stewart LLP, Boston, MA, for Stephen S. Gray.

J. Alex Kress, Dennis J. Krumholz, Riker, Danzig, Sherer, Hyland & Perretti LLP, Morristown, NJ, Andrew G. Lizotte, Hanify & King, Boston, MA, for Jeanne Mellen and Raymond Mellen.

## MEMORANDUM

TAURO, District Judge.

### I. *Introduction*

This appeal arises from the liquidating Chapter 11 bankruptcy of High Voltage Engineering Corporation ("HVEC"). Mellen Pride Sales Company, Inc. ("Pride") appeals the bankruptcy court's approval of settlements that HVEC and its affiliated debtors (collectively "the Debtors") reached with Raymond and Jeanne Mellen (collectively "the Mellens") and the New Jersey Department of Environmental Protection ("NJDEP"). For the following reasons, the bankruptcy court's judgment is AFFIRMED.

### II. *Background* [1]

The property at issue is a 7.5–acre parcel of land containing office, warehouse, and packaging space located in Woodbridge, New Jersey ("Property"). Between 1935 and 1973, the Property was owned by National Varnish Corporation ("National"), whose operations primarily consisted of the formulation and application of coating materials. An HVEC subsidiary acquired National in 1973 and continued similar operations at the Property until 1978, when the Mellens purchased the Property.

In 1987, Pride sought to purchase the Property from the Mellens. The proposed sale triggered the New Jersey Environmental Cleanup Responsibility Act ("ECRA"), which required the Mellens to investigate and remediate any environmental contamination of the Property before a sale could be consummated. The investigation revealed that the Property had been contaminated with numerous mineral spirits and chlorinated organic compounds. As a result, the Mellens and Mellen Chemicals, Inc. sued HVEC, contending that HVEC was responsible for remediating any environmental waste at the Property.

In 1989, the Mellens and Mellen Chemicals settled their lawsuit. The Mellens agreed to contribute $500,000 toward the cost of the environmental cleanup, and HVEC agreed to assume full responsibility for the cleanup and to provide the NJDEP with a $6,000,000 financial assurance. Later in 1989, the NJDEP executed an administrative consent order ("ACO"), which required HVE, the Mellens, and Mellen Chemicals, jointly and severally, to implement and complete an NJDEP-approved cleanup plan. In addition, HVEC, the Mellens, Mellen Chemicals, and Pride signed a settlement agreement ("1989 Settlement Agreement"), which provided for Pride's purchase of the Property for $2,100,000 and mandated compliance with the ACO and ECRA. The purchase was finalized on September 25, 1989, and Pride has owned the Property to this day.

The NJDEP approved a plan for remediating the Property in 1990, and remediation began in 1997. Furthermore, HVEC successfully petitioned the NJDEP in 1990, 1992, and 1997 to reduce the financial assurance from $6,000,000 to $1,420,000. Despite the remediation efforts, the Prop-

---

**1.** For purposes of this appeal, Appellees have agreed to adopt Pride's Statement of Facts.

*See* Appellees Br. 4; Appellant Br. 3–11.

erty continues to be contaminated with mineral spirits and chlorinated solvents. In its November 2, 2007 Notice of Violation to HVEC, for example, the NJDEP stated that, in the western portion of the Property, volatile organic compounds were at "extremely elevated and increasing levels" and at "the highest concentrations recorded since November 1994."[2]

On November 13, 2007, the Debtors' Liquidating Supervisor moved for authorization to abandon the Debtors' reversionary interest in the $1,420,000 financial assurance held by the NJDEP and for relief from any further obligations to remediate environmental waste at the Property ("Abandonment Motion"). The NJDEP filed objections on November 27, 2007 and January 7, 2008, and the Mellens filed an objection and cross-motion on January 9, 2008. Pride did not file a response to the Abandonment Motion.

Following discussions between the Liquidating Supervisor, the Mellens, and the NJDEP, two settlement agreements ensued. Pursuant to the settlement agreement between the Liquidating Supervisor and the Mellens ("Mellen Settlement Agreement"), the Liquidating Supervisor is to pay the Mellens $2,225,000 in exchange for the Mellens releasing their claims against the Debtors. Pursuant to the settlement agreement between the Liquidating Supervisor and the NJDEP ("NJDEP Settlement Agreement"), the Liquidating Supervisor is to release any claims to the $1,420,000 financial assurance in exchange for the NJDEP releasing the Debtors from their obligations to remediate the environmental waste at the Property.

On June 23, 2008, the Liquidating Supervisor moved for authority to cause the Debtors to enter into the Mellen and NJDEP Settlement Agreements. The bankruptcy court heard oral arguments on September 10, 2008 ("Hearing") and issued judgment approving the Settlement Agreements and denying the Abandonment Motion ("Decision" and "Order") on November 7, 2008. On November 14, 2008, Pride filed its notice of appeal.

III. *Discussion*

A. *Standard of Review*

 The standard of review for a bankruptcy court's approval of a settlement is abuse of discretion.[3] A district court reviews de novo conclusions of law and any legal significance accorded to facts, but it must accept the bankruptcy court's findings of fact unless they are "clearly erroneous."[4]

B. *Standing*

 Appellees contend that Pride lacks standing to object to the Settlement Motion because it is not a creditor of the Post–Confirmation Estate and never filed a proof of claim against the Debtors. Section 1109(b) of the Bankruptcy Code lists examples of "parties in interest" who may be heard in a Chapter 11 case, but "courts have not viewed the examples of parties in interest as being exhaustive" and "must determine on a case by case basis whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation."[5] To have stand-

---

2. R. Ex. 4, Mellen Aff. Ex. C at 1.

3. *See In re Anolik,* 107 B.R. 426, 429 (D.Mass. 1989).

4. *See Ranalli v. Ferrari (In re Unifi Commc'ns, Inc.),* 317 B.R. 13, 16 (D.Mass.2004).

5. *In re Amatex Corp.,* 755 F.2d 1034, 1042 (3d Cir.1985) ("Section 1109(b) continues the pattern of permitting interested parties in bankruptcy cases the absolute right to be heard and to insure their fair representation.").

ing to appeal a final bankruptcy order, an appellant must be a "person aggrieved," which means that the bankruptcy order must "directly and adversely affect[ ] [the appellant's] pecuniary interests." [6] The order must "diminish the [appellant's] property, increase [the appellant's] burdens, or detrimentally affect [the appellant's] rights." [7]

In this case, the bankruptcy court did not err in holding that Pride had standing to object to the Settlement Motion. As a beneficiary of the ACO, a signatory to the 1989 Settlement Agreement, the present owner of the Property, and the party bearing liability for cleanup costs that exceed any financial assurances received by the NJDEP from the Debtors and the Mellens, the outcome of the Settlement Motion clearly affects Pride's pecuniary interests.

### C. The Merits

Pride raises four "points" on appeal: (1) the standard by which the bankruptcy court evaluated the Settlement Motion; (2) the bankruptcy court's legal conclusions; (3) the bankruptcy court's alleged abdication of its responsibility to determine if the Settlement Agreements violated public policy; and (4) the bankruptcy court's finding that the Liquidating Supervisor met his burden of persuasion.[8] This court addresses each point in turn.

### 1. Standard of Review for Settlement Agreements

Pride's first argument is that a bankruptcy court "may not act as the Liquidating Supervisor's rubber stamp." [9] Far from rubber-stamping the Liquidating Supervisor's Settlement Motion, the bankruptcy court independently reviewed the Settlement Agreements according to the applicable legal standards. A bankruptcy court must determine if a proposed settlement is "fair and equitable." [10] To do this, the bankruptcy court considers numerous factors, including:

> (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.[11]

Courts have also considered "the experience and competence of the fiduciary proposing the settlement" [12] and public policy.[13]

Here, the bankruptcy court did not abuse its discretion in approving the Settlement Agreements. The bankruptcy court's forty-six page Decision weighed the probability of success in litigation between the Debtors, the Mellens, and the NJDEP, taking into account the complexity of the

---

6. *Spenlinhauer v. O'Donnell,* 261 F.3d 113, 117–18 (1st Cir.2001) (citations and quotations omitted).

7. *Kehoe v. Schindler (In re Kehoe),* 221 B.R. 285, 287 (1st Cir. BAP 1998) (citations and quotations omitted).

8. *See* Appellant Br. 11–20.

9. *Id.* 11.

10. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390

U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968).

11. *Jeffrey v. Desmond,* 70 F.3d 183, 185 (1st Cir.1995).

12. *Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.),* 136 F.3d 45, 50 (1st Cir.1998).

13. *See In re Telcar Group, Inc.,* 363 B.R. 345, 357 (Bankr.E.D.N.Y.2007).

legal issues presented in this case.[14] The court respected the views of the equity holders, who were in favor of the Settlement Agreements.[15] It recognized the Liquidating Supervisor's achievements in the Debtors' other cases as indicative of his experience, competence, and sound business judgment.[16] And it appropriately viewed the NJDEP, as an arm of the state, as being best-positioned to promote New Jersey public policy.[17] These factors sufficiently demonstrated that the Settlement Agreements were fair and equitable.

## 2. Legal Issues

Pride's second argument is that the bankruptcy court erred in its legal conclusions. In reviewing the Settlement Agreements, the bankruptcy court considered whether HVEC's duties under the ACO and the 1989 Settlement Agreement gave rise to dischargeable claims held by the Mellens and the NJDEP. In these situations, the general rule is that "any order that to any extent ends or ameliorates continued pollution is not an order for breach of an obligation that gives rise to a right of payment and is for that reason not a 'claim.' "[18]

The question of whether the Mellens and the NJDEP possessed dischargeable claims raises numerous issues: Did the environmental waste at the Property constitute "continued pollution"? Were the ACO and the 1989 Settlement Agreement orders to "end or ameliorate" continued pollution or merely to "remove" accumulated waste?[19] Does the analysis change given that HVEC was liquidated rather than reorganized, leaving only "cash" to remedy any continued pollution?[20] Though the bankruptcy court ultimately found that the Mellens and the NJDEP possessed dischargeable claims, the intersection of bankruptcy and environmental law is an area of undoubted complexity. At the time of the settlement negotiations, the probability of success in litigation would have been in doubt for any of the parties involved, heightening the risk of expensive, protracted litigation and delayed collection. Settlement, rather than litigation, was a reasonable resolution to the complex legal and factual issues raised in this case.

## 3. Public Policy

Pride's third argument is that the bankruptcy court abdicated its responsibility to determine if the Settlement Agreements violated New Jersey public policy. This argument fails. Not only did the bankruptcy court acknowledge its obligation to consider the effects of the Settlement

---

**14.** *See* R. Ex. 14, Decision 41–42.

**15.** *See id.* 42.

**16.** *See id.*

**17.** *See id.*

**18.** *United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997, 1008 (2d Cir.1991), *quoted in Torwico Elecs., Inc. v. N.J. Dep't of Envtl. Prot. (In re Torwico Elecs., Inc.),* 8 F.3d 146, 149–50 (3d Cir.1993).

**19.** *See In re Chateaugay,* 944 F.2d at 1008 ("[A]n order to clean up a site, to the extent that it imposes obligations distinct from any obligation to stop or ameliorate ongoing pollution, is a 'claim' if the creditor obtaining the order had the option, which CERCLA confers, to do the cleanup work itself and sue for response costs....").

**20.** *See State Department of Environmental Protection v. IT Litig. Trust (In re the IT Group, Inc.),* 339 B.R. 338, 342 (D.Del.2006) ("The Debtors in this case have ceased operations, and their remaining assets have been vested in the Trust.... Thus, the only way for the Trust to comply with the Administrative Order is for the Trust to render the payment of money.").

Agreements on public policy,[21] but the court specifically found that "the State of New Jersey is in the best position to promote and protect its policies concerning environmental issues." [22]

### 4. *Liquidating Supervisor's Burden of Persuasion*

Pride's final argument is that the Liquidating Supervisor failed to meet his burden of persuading the bankruptcy court that the Settlement Agreements were fair and equitable.[23] The Settlement Motion, Reply in support of the Settlement Motion, and arguments at the Hearing all demonstrate that the Liquidating Supervisor considered the legal and factual issues involved in this case.[24] Moreover, the Liquidating Supervisor has amassed "more than 30 years experience in working with troubled companies and debtors and has served as Chapter 11 trustee, state or federal receiver, examiner and post-confirmation fiduciary in numerous situations." [25] Given his thorough pleadings and demonstrated experience, the Liquidating Supervisor met his burden of persuasion.

### IV. *Conclusion*

For the foregoing reasons, the bankruptcy court's judgment approving the Settlement Agreements is AFFIRMED.

AN ORDER HAS ISSUED.

---

**21.** *See* Decision 40 (citing *In re Telcar*, 363 B.R. 345).

**22.** *Id.* 42.

**23.** *See Protective Comm.*, 390 U.S. at 434, 88 S.Ct. 1157 ("It is essential ... that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boilerplate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law.").

**24.** *See* R. Exs. 8, 11, 13.

**25.** *Id.* Ex. 11 at ¶ 22.