In re WOLVERINE, PROCTOR & SCHWARTZ, LLC, Debtor.

Peter A. Crawford, pro se, Appellant,

v.

Lynne F. Riley, Chapter 7 Trustee of Wolverine, Proctor & Schwartz, LLC, and the Pension Benefit Guaranty Corporation, Appellees.

No. 09–11038–DPW.

United States District Court, D. Massachusetts.

March 12, 2010.

---

*MEMORANDUM AND ORDER*

DOUGLAS P. WOODLOCK, District Judge.

This is an appeal from the Bankruptcy

Court's Order[1] approving a settlement agreement (the "Settlement Agreement") between the Pension Benefit Guaranty Corporation ("PBGC") and the Trustee of Wolverine Proctor & Schwartz, LLC (the "Debtor"),[2] Lynne F. Riley (the "Trustee"). In approving the Settlement Agreement, Judge Feeney overruled objections filed by a putative creditor and former employee of a predecessor to the Debtor, Peter A. Crawford ("Crawford"), the pro se appellant in this matter. For the reasons stated below, I affirm the Bankruptcy Court's Order.

## I. BACKGROUND

### A. The Debtor and the Pension Plan

On January 1, 1964, the Debtor established the Proctor & Schwartz Salaried Employees Retirement Plan (the "Plan") to provide retirements benefits for certain employees. The Plan was an employee pension benefit plan to which Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., applied. Ultimately, the Debtor became the administrator of the Plan within the meaning of 29 U.S.C. §§ 1002(16) and 1301(a)(1).

On April 1, 2006 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code. As of the Petition Date, most of the Debtor's operations had ceased and all employees were terminated, with the exception of certain employees who were retained for a brief period without benefits. The Bankruptcy Court approved the Trustee's sale of substantially all of the Debtor's assets

to CPM Holdings for a purchase price of $8.7 million on June 28, 2006.

In January 2007, the PBGC advised the Trustee that the administrative process to terminate the Plan was underway. Shortly thereafter, the PBGC issued a Notice of Determination under 29 U.S.C. § 1342(a) that the Plan had not met the minimum funding standard required under § 412 of the Internal Revenue Code. The PBGC also informed the Trustee that the Plan would be unable to pay benefits when due and that it was required to be terminated under 29 U.S.C. § 1342(c).

The PBGC subsequently forwarded to the Trustee for execution an Agreement for Appointment of Trustee and Termination of the Plan, pursuant to which the Plan was terminated as of April 1, 2006. Under this Agreement, which was later executed with an effective date of March 26, 2007, the PBGC was appointed trustee of the Plan, and the Trustee of the Debtor agreed to deliver all records, assets or property of the Plan to the PBGC.

### B. The PBGC Claims

On July 26, 2006, shortly before the expiration of the applicable bar date for proofs of claim, the PBGC filed three proofs of claim (collectively, the "PBGC Claims"):

> Claim No. 70 pursuant to which the PBGC asserted a claim, contingent upon plan termination, estimated in the amount of $6,991,500 for unfunded benefit liabilities, including an unliquidated amount as a priority claim ("Claim No. 70");

---

1. *In re Wolverine Proctor & Schwartz, LLC,* No. 06–10815, 2009 WL 1271953 (Bankr. D.Mass. May 5, 2009).

2. Proctor & Schwartz was acquired by Wolverine Corporation in 1994 and the surviving company was named Wolverine, Proctor &

Schwartz, Inc. ("Wolverine Inc.") in 1999. On February 11, 2005, Wolverine Inc. was dissolved and some of its assets and liabilities, including the pension liabilities, were transferred to Wolverine, Proctor & Schwartz, LLC.

Claim No. 71 pursuant to which the PBGC asserted a claim in the amount of $2,012,393 for minimum funding contributions, of which $1,340,217 was entitled to priority ("Claim No. 71"); and

Claim No. 72 pursuant to which the PBGC asserted entitlement to an unliquidated priority amount for premiums on account of the Plan ("Claim No. 72").

In attachments to each of these claims, the PBGC noted that its investigation was "continuing" and that it reserved "the right to amend, modify and supplement th[ese] proof[s] of claim and/or to file additional proofs of claim."

### C. The Trustee's Objections to the PBGC Claims

On December 15, 2006, the PBGC produced, in response to the Trustee's request for documentation, certain reports, including data, calculations and actuarial analysis with respect to the PBGC Claims (the "Actuarial Reports").

While admitting that the PBGC had claims in these bankruptcy proceedings, the Trustee filed objections to the PBGC Claims on October 28, 2008. The Trustee disputed the PBGC's classification of portions of the PBGC Claims as being either administrative expenses or priority claims, the method of calculation and the lack of documentation supporting the PBGC Claims, and the potential overlap and duplication such claims. Specifically with respect to Claim No. 70, the Trustee objected to "the form of the proof of claim as she [wa]s unable to determine with any certainty the amount claimed by the PBGC, and call[ed] upon the PBGC to formally amend the proof of claim."

The Trustee subsequently requested further documentation to support Claim 72. On November 10, 2008, the PBGC produced two premium statements assert-

ing a total amount due of $129,409.37 (the "Premium Statements").

### D. The Trustee's Motion to Approve Settlement Agreement

After their respective investigations and negotiations, the Trustee and the PBGC entered into the Settlement Agreement and the Trustee filed a motion seeking approval of the Settlement Agreement on December 9, 2008. In the motion, the Trustee contended that the Settlement Agreement was reasonable because it was based upon further investigation of the PBGC Claims and the various reports prepared by the PBGC and would avoid the costs, delay and complexity of litigating the issues raised by such claims.

The terms of the Settlement Agreement provide for the allowance of the PBGC Claims as follows:

Claim No. 70 to be settled as an "Unfunded Benefit Liabilities Claim" (the "UBL Claim") in the amount of $8,399,500; it would be a general unsecured claim;

Claim No. 71 to be settled as an "Unpaid Minimum Funding Contribution Claim" (the "UMFC Claim") in the amount of $50,000; it would be an unsecured priority claim; and

Claim No. 72 to be settled as a "Plan Premiums Claim" (the "PP Claim") in the amount of $101,084.25; it would be a general unsecured claim.

### E. Crawford's Objections to the Trustee's Motion to Approve Settlement Agreement

On January 5, 2009, Crawford filed objections to the Trustee's motion for approval of the Settlement Agreement. In essence, Crawford alleged that the Trustee failed to investigate the PBGC Claims adequately and to obtain sufficient documenta-

tion to support such claims.[3] Crawford did not, however, object to the Trustee's decision to settle the UMFC Claim and the PP Claim,[4] rather he focused his objection on the UBL Claim.

More specifically, Crawford pointed to a $1.458 million difference between the amount of Claim No. 70 and the amount of the UBL Claim.[5] Crawford alleged that the PBGC's failure to file amended proofs of claim to reflect the difference was indicative that "the PBGC has coerced the Trustee into settlement by stonewalling, inducing settlement for an inflated amount by largely giving up its essentially frivolous assertions of administrative and tax priorities."

In addition, Crawford pointed to a $2.564 million difference between the amount of unfunded liabilities reported in the 2004 financial statement of the Debtor's predecessor and the amount asserted by the PBGC as of January 1, 2005. In addition, Crawford contended that the PBGC's estimate was erroneous because it was based on the false assumption that the Plan participants were half male and half female whereas Plan participants were predominantly male.

Finally, Crawford objected to the method of calculation of the UBL Claim, arguing that the discount rate used by the PBGC should be higher and determined with reference to bankruptcy law principles.

### F. The PBGC and the Trustee's Responses

On February 12, 2009, the PBGC submitted Claim Nos. 70–2 and 70–3, which amended Claim No. 70 by increasing its amount from $6,991,500 to $8,449,471. On the same day, the PBGC submitted Claim No. 72–2 amending Claim No. 72 by setting forth an amount of $129,409.37, where no amount had been specified initially.

On February 18, 2009, the PBGC and the Trustee submitted their respective responses to Crawford's objections. The Trustee argued that she properly investigated the PBGC Claims and the underlying documentation and that, contrary to Crawford's assumptions, "there were not [sic] significant errors in the calculations." Specifically, the Trustee asserted that the valuation of the Plan set forth in the Actuarial Reports was consistent with the Trustee's valuation of the Plan.

For its part, the PBGC argued that its methodology in calculating the UBL Claim had the force of the law and supported a business justification for the Settlement Agreement. The PBGC further contended that the PBGC's assumptions regarding gender of participants did not improperly increase the amount of the UBL Claim. In support of this assertion, the PBGC ex-

---

3. In particular, Crawford contended that there was no indication that the extensive document review conducted by the Trustee's accountants resulted in any changes to the PBGC Claims and that the PBGC ever provided the Trustee with any documents other than the Actuarial Reports or the Premium Statements to support the PBGC Claims.

4. While Crawford did not formally contest the Trustee's decision to settle the UMFC Claim or the PP Claim, he did suggest that the UMFC Claim might have been settled at a large reduction due to a $130,000 discrepan-

cy between the 2005 expected contribution of $482,500 and the 2005 actual contribution of $352,500.

5. Under the Settlement Agreement, the PBGC is entitled to the full amount of the UBL Claim (i.e. $8,449,500), minus the $50,000 allowed amount of the UMFC Claim (i.e., $8,399,500). To calculate the $1.458 million difference referred to above, it appears that Crawford substituted the amount of Claim No. 70 (i.e., $6,991,500) to the full amount of the UBL Claim (i.e., $8,449,500).

plained that new mortality tables effective as of January 1, 2006 resulted in a reduction in the difference in life expectancies between males and females. The PBGC therefore concluded that "to calculate PBGC's unfunded benefit liabilities using the 2005 AVR [Actuarial Valuation Report] to the date of the bankruptcy filing, an increase in the assumed amount of male participants would result in a larger UBL Claim," rather than in a lower amount as suggested by Crawford.

Both the PBGC and the Trustee contended that, under the circumstances, the Settlement Agreement was fair and reasonable.

### G. The Bankruptcy Court Hearing and Order

The Bankruptcy Court held a hearing on the Trustee's motion for approval of the Settlement Agreement and Crawford's objections on February 24, 2009. In addressing Crawford's objection with respect to valuation of the PBGC Claims, the Trustee contended:

> the valuation was based on the actuarial report attached as Exhibit 1 to the settlement. The amount in the valuation had been extrapolated utilizing the 2005 Hewitt Report; however, it did correspond with a valuation report that I received from Citigroup Smith Barney dated March 31, 2006.... showing the plan assets as of March 31, the day before the filing, were ten thousand [sic] 689 thousand dollars.... as of the filing date, there were approximately $16,400 in outstanding charges to money managers in the Bank of New York which redu—[sic] would have reduced that value to 10,672; and inasmuch this was very close to what the actuary had found in her report, I find that they were substantially the same, and that the calculation was not deficient.

More specifically, with respect to the discount rate applicable to the UBL Claim, the Trustee contended that it would not be appropriate for her to:

> be prosecuting the UBL claim based on the two decisions in other Circuits, namely, the Sixth Circuit's *CSC Industries* case, and the Tenth Circuit's *CFI* case.... [when] [w]e have four decisions subsequent, including this Court's decision in *High Voltage* ... And in all of these, the UBL claim is calculated in accordance with ERISA and the regulations found in 29 CFR Section 4044.

The PBGC explained the increase in the amount of the UBL Claim as follows:

> the principal reason the unfunded benefit liability did rise, as the Trustee says, is the change in discount rate from the valuation date of July '06 to April '06, which is the Chapter 7 filing date, and the difference in those months results in a difference in discount rates from 6.3 per cent downward to 5.6 per cent ... So that's the principal reason the numbers have been adjusted.

The Trustee addressed Crawford's objection with respect to the gender ratio as follows:

> if we take the assumption of 80 per cent male and we insert it into the PBGC's actuarial reporting, it actually results in a higher amount. And the PBGC explains that in their response; and what they say is that in—as of January 2006 they were—they had updated mortality tables which they were required to apply ... and because the life expectancy of males when compared to females under the updated tables is less than the prior gap that existed under the 1983 GAM [Group Annuity Mortality] tables, an increase assumed amount of the male participants resulted in a larger UBL claim.

During this hearing, Crawford introduced a new argument regarding co-debtor liability suggesting the Trustee's duty to seek disallowance of the entire UBL Claim based on his interpretation of *In re Hemingway Transport, Inc.*, 993 F.2d 915 (1st Cir.1993) and 11 U.S.C. § 502(e)(1)(B) and his assertion that the PBGC was actually a co-debtor.

The Bankruptcy Court granted the Trustee's motion to approve the Settlement Agreement and overruled Crawford's objections in a May 5, 2009 decision. *In re Wolverine Proctor & Schwartz, LLC,* No. 06–10815, 2009 WL 1271953 (Bankr. D.Mass. May 5, 2009). In doing so, Judge Feeney found that the Settlement Agreement was fair and reasonable because "[t]he Trustee evaluated the merits of the PBGC's various claims, achieved a sizeable reduction in the amount of its priority claims, and avoided protracted and complex litigation with respect to the merits of the claims." *Id.* at *4. She also noted that the Trustee and the PBGC had appropriately addressed the gender ratio issue and had correctly applied the emerging line of cases with respect to the applicable discount rate. *Id.* at *5. Judge Feeney found Crawford's remaining arguments speculative and without evidentiary support. *Id.* Finally, Judge Feeney gave recognition to her view that the Trustee was an experienced attorney known for competence and integrity, who she found had properly performed her duties under 11 U.S.C. § 704.

### H. Crawford's Motion to Reconsider the Bankruptcy Court's Order and the Bankruptcy Court's Subsequent Denial

On May 15, 2009, Crawford filed a motion to reconsider the Bankruptcy Court's ruling approving the Settlement Agreement. As the basis for reconsideration, Crawford contended that the Bankruptcy Court failed to address his newly raised argument at the February 24, 2009 hearing regarding co-debtor liability.

The Trustee filed an opposition to Crawford's motion for reconsideration on May 22, 2009. The PBGC subsequently adopted the Trustee's position. On June 8, 2009, the Bankruptcy Court issued an order denying Crawford's motion for reconsideration.

Crawford filed a notice of appeal under 28 U.S.C. § 158(c) on June 10, 2009, bringing the appeal to this Court.

### I. Other Associated Proceedings

Between 2005 and 2008, Crawford filed four civil actions in this Court arising from themes and variations on the basic claim that he is owed additional compensation from the Debtor and its affiliates. *Crawford v. Wolverine Proctor & Schwartz, Inc. et al.,* Nos. 05–10078, 07–10279, 08–10048, and 08–11886 (D.Mass.). These four civil actions (the "consolidated matters") were assigned to me and were later treated in a consolidated manner for efficiency of proceeding. The consolidated matters have followed a tortured and tortuous path to disposition before me. The first case filed, 05–10078, was automatically stayed as to the Debtor in April 2006. Given the pending bankruptcy, I deferred ruling on summary judgment motions filed by the non-debtor defendants until the dispute in all its dimensions was before me. The claims against the Debtor returned to me when, on the motion of the parties in 07–10279, I withdrew the reference to the bankruptcy court with respect to Crawford's claims in order to permit orderly disposition of the merits on such claims against the Debtor and others. In August 2007, I granted summary judgment as to all claims, except those related to any express contract as to a bonus for Crawford.

Shortly before the trial on the bonus issues was set to begin in January 2008, Crawford attempted to introduce a new quantum meruit theory of bonus entitlement through amendment of pleadings. I rejected the amendment and the matters went to trial during January and February 2008. Meanwhile, Crawford filed 08–10048 essentially to assert his belated asserted quantum meruit theory. For her part, the Trustee later moved in 08–11886 to withdraw the bankruptcy reference concerning Crawford's amended claim filed in the Bankruptcy Court and asserting a quantum meruit theory. The first trial, however, ended in mistrial when it was discovered during deliberations that jurors, in violation of instructions, undertook to supplement the evidence with their own internet searches.

I reset the matter for a second trial in June 2009 and rejected on summary judgment the quantum meruit theory newly framed in 08–10048. The jury verdict in the second trial on June 22, 2009 supported judgment on the merits for the defendants. On December 4, 2009, I entered two separate judgments in the consolidated cases. In 05–10078 and 08–10048, a judgment was entered for all defendants against the claims brought by Crawford. As to the two bankruptcy reference withdrawal matters, 07–10279 and 08–11886, I entered judgment disallowing Crawford's claims against the Debtor, essentially holding there was no liability of the Debtor and its affiliates to Crawford.

Crawford has since filed Motions for Judgment as a Matter of Law and for New Trial in the four civil actions. They are currently pending before me. Crawford also filed an appeal of the judgments I entered in the bankruptcy reference withdrawal proceedings. Those appeals are also pending.[6]

## II. STANDARD OF REVIEW

Review of the Bankruptcy Court order on appeal before me is governed by Rule 8013 of the Federal Rules of Bankruptcy, which provides a District Court "may affirm, modify or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." FED. R. BANKR. P. 8013.

■■■ When a District Court reviews a decision of the bankruptcy court, findings of fact are disregarded only if clearly erroneous, but questions of law are subject to *de novo* evaluation. *See* FED. R. BANKR. P. 8013; *Groman v. Watman (In re Watman)*, 301 F.3d 3, 7 (1st Cir.2002). Specifically, the standard of review regarding bankruptcy court approval of a settlement is abuse of discretion. *See Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir.1995) ("The approval of a compromise is within the sound discretion of the bankruptcy judge ... this court will not overturn a decision to approve a compromise absent a clear showing that the bankruptcy judge abused her discretion.") (citing *In re Anolik*, 107 B.R. 426, 429 (D.Mass.1989)).

## III. DISCUSSION

Before addressing the merits of the appeal, I must first determine whether

---

**6.** The appeals filed in these bankruptcy referral withdrawal matters were prophylactic. Despite a stipulation between the parties, there is uncertainty as to whether the appeal period for a motion, such as that presented by Crawford's motions for reconsideration of his claims, under Bankruptcy Rule 3008 would be tolled by the filing of post judgment motions as it would be under Bankruptcy Rule 9023, which incorporates Federal Rule of Civil Procedure 59. In order to avoid any question of timely appeal, given this uncertainty, Crawford promptly noticed his appeal in the bankruptcy referral withdrawal matters while also submitting post judgment motions in this Court.

Crawford has standing to prosecute the appeal. While I find Crawford has standing, I nevertheless conclude his appeal is unavailing on the merits.

## A. Standing

██ The issue of standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In order to have standing to appeal a final bankruptcy order, an appellant must be a "person aggrieved," which means that the bankruptcy order must "directly and adversely affect ... [the appellant's] pecuniary interests." *In re High Voltage Eng'g Corp.,* 403 B.R. 163, 166–67 (D.Mass.2009) (quoting *Spenlinhauer v. O'Donnell,* 261 F.3d 113, 117–18 (1st Cir.2001)). Specifically, the order must "diminish the [appellant's] property, increase [the appellant's] burdens, or detrimentally affect [the appellant's] rights." *Id.* (quoting *Kehoe v. Schindler (In re Kehoe* ), 221 B.R. 285, 287 (1st Cir. BAP 1998)).

██ The Trustee contends that Crawford lacks standing to appeal the Bankruptcy Court's Order because the breach of contract claim, through which he purports to have creditor status, was rejected by the jury verdict rendered in the consolidated matters, thereby preventing Crawford from qualifying as a "person aggrieved." I find this argument borderline frivolous. Crawford's claims remain alive, he has post-trial motions pending in this court and there is no reason to doubt he will prosecute appeals should the post-trial motions be decided adversely to him. Indeed, after the Trustee filed its brief and I entered judgment in the several consolidated matters, Crawford filed appeals in the bankruptcy referral withdrawal cases. *See* Note 6 *supra.* Because the judgments as to Crawford's multiple claims are not

yet fully final and avenues of appeal remain open to and are being pursued by him, I find Crawford has not lost standing to prosecute the present appeal.

## B. The Merits

██ Crawford raises five grounds as support for his contention that approval of the Settlement Agreement was erroneous: (1) the Trustee did not properly investigate the PBGC Claims, (2) the PBGC failed to apply the proper discount rate in calculating the UBL Claim, (3) the PBGC did not follow its own regulation and relied on erroneous assumptions in calculating the UBL Claim, (4) the UBL Claim is subject to disallowance under Section 502(e) of the Bankruptcy Code, and ultimately (5) the Bankruptcy Court failed to apprise itself of all facts necessary for an informed opinion regarding the Settlement Agreement. The first three grounds are most usefully addressed in this Memorandum as separate settlement choices made by the Trustee. The fourth and fifth grounds concern the Bankruptcy Court's review of the ultimate settlement choice.

### 1. Investigation by the Trustee

Crawford's argument that the Trustee failed to conduct adequately any meaningful investigation of the PBGC Claims before entering into the Settlement Agreement is without merit. The evidence shows to the contrary. The Trustee thoroughly reviewed the documentation produced by the PBGC as well as the case law pertaining to the classification and the calculation of the PBGC Claims. As noted by the Bankruptcy Court, and as Crawford conceded, the Trustee engaged her accountant to assist her in evaluating the claims. *In re Wolverine,* 2009 WL 1271953, at *4. It was only after conducting appropriate investigation of the PBGC Claims and undertaking careful consider-

ation of the implications of the Settlement Agreement that the Trustee agreed to its terms. This fact is further supported by the PBGC's declaration during the February 24, 2009 hearing that the Trustee and the PBGC "had a vigorous and very detailed exchange of information prior to reaching our settlement."

More specifically, I find that the Trustee has properly addressed the issue regarding the valuation of the pension plan assets set forth in the Actuarial Reports both in her initial response to Crawford's objections, as well as during the February 24, 2009 hearing. I make this finding in light of the First Circuit's instruction that a trustee need not fix the value of a claim "with near mathematical precision" before it can be settled. *In re Healthco Int'l, Inc.*, 136 F.3d 45, 51 (1st Cir.1998) (citing *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1145 (1st Cir.1992)) ("[A] chapter 7 trustee ... realistically cannot be required to demonstrate to the satisfaction of every individual creditor and the debtor, or to any compelling degree of certitude, that the settlement benefit to the chapter 7 estate and the value of the settled claim comprise a matched set.").

Accordingly, I share the conclusion of the Bankruptcy Court that the Trustee properly "evaluated the merits of the PBGC's various claims." *In re Wolverine*, 2009 WL 1271953, at *4.

### 2. Discount Rate

Crawford's argument is that the Settlement Agreement rests upon an inappropriate discount rate with respect to the UBL Claim, which implicates a legal question concerning the role of non bankruptcy substantive law in bankruptcy proceedings. Specifically, Crawford contends that the Bankruptcy Court should have rejected the application of the PBGC's regulation regarding the discount rate in favor of a so-called "prudent investor" discount rate found in opinions of two Circuit Courts. *See In re CSC Indus., Inc.*, 232 F.3d 505, 509 (6th Cir.2000) ("[w]hile the *validity* of a claim might be a matter for non bankruptcy law, bankruptcy courts have the statutory authority to determine the *allowability* and *amount* of the claim"); *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1293, 1301 (10th Cir.1998) ("Nothing in the ERISA sections relied upon by PBGC implies a carry-over into the realm of bankruptcy to allow PBGC to set its own valuation methodology. Even though that methodology was adopted in the exercise of PBGC's administrative authority, we have no doubt of its inapplicability in the world of bankruptcy.").

This issue is framed and governed by the Supreme Court's opinion in *Raleigh v. Ill. Dept. of Revenue*, 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000), which held that, absent some particular direction from the Bankruptcy Code, the underlying substantive law governs entitlements in the bankruptcy context. The Sixth Circuit's opinion in *CSC Industries* was issued shortly after *Raleigh* was handed down, and the Tenth Circuit's decision in *CF & I Fabricators* substantially predated *Raleigh*. Neither, in my view, adequately incorporated the approach adopted in *Raleigh*.

I find more persuasive the reasoning of *In re U.S. Airways Group, Inc.*, 303 B.R. 784, 792–93 (Bankr.E.D.Va.2003) (expressing disagreement with the Sixth and Tenth Circuits and concluding that "*Raleigh* is very clear that a creditor's claim 'in the first instance' is a function of the nonbankruptcy law giving rise to the claim" and that "it is simply not a correct reading of *Raleigh* to say that nonbankruptcy law determines only the abstract validity of the claim ... as divorced from the *amount* of the claim."). As noted by the Bankruptcy

Court in this matter, more recent cases have similarly rejected the position held in *CSC Industries* and *CF & I Fabricators* and concluded that *Raleigh* requires the amount of the claim to be determined by nonbankruptcy law. *See Dugan v. PBGC (In re Rhodes, Inc.)*, 382 B.R. 550, 560 (Bankr.N.D.Ga.2008) ("PBGC is authorized by law to make a determination of the amount of its claim that is binding on Debtors and therefore on this Court."); *In re High Voltage Eng'g Corp.*, No. 05–10787–JNF, slip op. at 2 (Bankr.D.Mass. July 26, 2006) ("ERISA and the regulations found in 29 C.F.R. § 4044 control the calculation of the PBGC's claim in these solvent Chapter 11 cases."); *see also In re Kaiser Aluminum Corp.*, 339 B.R. 91, 96 (D.Del.2006) (agreeing with the Bankruptcy Court that "it is difficult to envision who would succeed" in the face of a conflict in the applicable law on discount rates, but holding that the Bankruptcy Court did not abuse its discretion in approving the settlement of a claim calculated pursuant to PBGC's regulation).

Even in the absence of any decisions from the First Circuit to the contrary, I share the conclusion of Judge Feeney that "the Trustee['s] decision to adopt the emerging line of cases was reasonable." *In re Wolverine*, 2009 WL 1271953, at *5. Judge Feeney herself had provided precedent for the Trustee's position in a previous ruling. *High Voltage*, slip op. at 1–2. No doubt the Trustee could have acted within her responsibilities by challenging Judge Feeney's holding in *High Voltage*. Unlike Judge Farnan in *Kaiser Aluminum*, however, I have no difficulty con-cluding that Judge Feeney's opinion in *High Voltage* properly states the law and the Trustee was correct in following that holding on the merits. Moreover, even if the issue were in doubt, the Trustee acted reasonably by choosing to settle the dispute in the face of an unsettled question. The issue involves a core contention by the PBGC, an institutional litigant intent—as a matter of precedent—on not compromising the integrity of its regulations. Litigation with the PBGC would lead to lengthy delay, increased litigation costs and uncertain risks of further exposure for the bankrupt estate. The Trustee acted reasonably in avoiding litigation with the PBGC as a result of dispute over this issue.

### 3. Method of Calculation

Crawford contends that the method used by the PBGC to calculate the UBL Claim is invalid because the PBGC failed to follow its own regulation by not calculating the UBL Claim participant by participant[7] and relied on false assumptions, in particular with respect to the gender of the participants.

As noted by the Bankruptcy Court, "[t]he method used by the PBGC in determining the amount of unfunded benefit liabilities is complicated." *In re Wolverine*, 2009 WL 1271953, at *4 (quoting *In re Rhodes, Inc.* 382 B.R. at 554). For purposes of calculating the UBL Claim, the PBGC assumed that the Plan participants were half male and half female although it is likely the participants were predominantly male. Crawford argues that this erroneous assumption may have resulted in an increase of the UBL Claim amount

---

7. To support this assertion, Crawford relies on 29 C.F.R. § 4044.51, which provides that "[t]he plan administrator shall determine the form of *each* benefit to be valued." 29 C.F.R. § 4044.51 (emphasis added). Crawford argues that the term "each" in this section manifestly indicates that the PBGC should have calculated the UBL Claim participant by participant. (*Id.*) Crawford does not, however, produce any authority supporting his interpretation of 29 C.F.R. 4044.51 in the bankruptcy claim process or the settlement process for such claims. I find this argument to be without merit.

because life expectancy is higher for females than for males. The PBGC has explained, however, that under the 2006 mortality tables, the difference between the life expectancy of females and males was lower than the gap that existed under the 2005 mortality tables and therefore concluded that an increase in the assumed number of male participants would result in a larger UBL Claim.

The issue, of course, is one of estimates and compromise and not one of precise benefit calculation. I share the view of the Bankruptcy Court that "the Trustee and the PBGC ably addressed and rebutted the points made in [Crawford's] Objection, in particular his assertion that the gender allocation increased the amount of the UBL claim." *In re Wolverine*, 2009 WL 1271953, at *5. The Trustees choice to settle despite this Objection was reasonable.

### 4. *Claim Disallowance under Section 502(e)(1)(B)*

Crawford argues that the UBL Claim is subject to disallowance pursuant to the liability of co-debtors set forth in Section 502(e)(1)(B) of the Bankruptcy Code.[8]

 Section 502(e)(1)(B) of the Bankruptcy Code provides as follows:

> Notwithstanding subsections (a), (b), and (c) of this section and paragraph (2) of this subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that . . .

> (B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution.

11 U.S.C. § 502(e)(1)(B). Thus, three elements need to be present for a claim to fall within this provision: (1) the claim must be one "for reimbursement or contribution;" (2) the entity asserting the claim must be "liable with the debtor on or ha[ve] secured the claim of a creditor;" and (3) the claim must be "contingent at the time of its allowance or disallowance." *Id.* Section 502(e)(1)(B) was enacted "to prevent . . . *competition between a creditor and his guarantor* for the limited proceeds of the estate." *Hemingway*, 993 F.2d at 923 (quoting S. REP. NO. 95.989, at 65 (1978)).

To support his assertion that the UBL Claim should be disallowed under Section 502(e)(1)(B), Crawford mainly relies on *Hemingway*, where the First Circuit vacated a district court's order[9] disallowing the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") claims brought by the purchaser of a contaminated real property from a Chapter 11 estate, after the conversion of the case to Chapter 7. *Id.* at 936. In adopting this position, the First Circuit's focus turned on whether the purchaser was "liable with" the debtors on the claims brought by the United States Environmental Protection Agency ("EPA") against them. *Id.* at 925–34. Specifically, the First Circuit declared that the purchaser "cannot escape the consequences of section 502(e)(1)(B) unless it is not strictly and jointly 'liable' with [the debtors] on the EPA debt." *Id.* at 930. The First Circuit

---

8. As discussed in Section I.G. *supra,* Crawford raised this argument for the first time during the February 24, 2009 hearing. The Bankruptcy Court did not expressly address this contention in the May 5, 2009 Order granting the Trustee's motion, but merely noted that "Crawford's remaining arguments . . .

[we]re speculative and without evidentiary support." *In re Wolverine,* 2009 WL 1271953, at *5.

9. *In re Hemingway Transp., Inc.,* 126 B.R. 656 (D.Mass.1991).

ultimately remanded this issue observing that, under Section 502(e)(1)(B), "[the purchaser]'s participation in any distribution from the chapter 7 estate hinge[d] entirely on the validity of its 'innocent landowner' defense." *Id.* at 933. Contrary to Crawford's contention, the First Circuit in *Hemingway* did not disallow the claim of a co-debtor under Section 502(e)(1)(B) but rather ruled that the disallowance of a claim under this section may depend on several factors, including in this specific instance on the "innocent landowner" defense.

In any event, the First Circuit in *Hemingway* did not address the present situation concerning whether the PBGC was "liable with" the debtor for purposes of claim disallowance under Section 502(e)(1)(B).[10] *Hemingway* did nothing to settle the law in this circuit on this issue. Moreover, other courts have held that ERISA preemption prevents plan participants from recovering directly from the plan sponsor. *United Steelworkers of Am. v. United Eng'g, Inc.* 52 F.3d 1386, 1393 (6th Cir.1995) (discussing federal common law actions brought directly against the employer under § 301 of the Labor Management Relations Act after the 1986 and 1987 amendments to ERISA and observing that "detailed provisions [by which the PBGC disburses non-guaranteed benefits] seem to allocate responsibility for disbursement of nonguaranteed benefits to the PBGC, strongly suggesting that suits against plan sponsors to recover those same benefits are precluded."); *In re Adams Hard Facing Co.*, 129 B.R. 662,

663 (W.D.Okla.1991) ("Under ERISA, the PBGC must collect the employer's unfunded benefit liabilities and distribute those amounts to plan participants within the priority scheme of § 4044(a). The direct claims of the participants in the Adams Plan are therefore disallowed.").

██ Under the circumstances, I conclude that the PBGC cannot be held "liable with" the Debtor for purposes of Section 502(e)(1)(B). There was no error in the Bankruptcy Court's implicit refusal to disallow the UBL Claim under Section 502(e)(1)(B).

*5. Appeal*

Crawford's argument that the Bankruptcy Court failed to apprise itself of all facts necessary for an informed opinion, illustrates his misguided approach to the settlement review process generally. Crawford misconceives the legal standard applicable to the approval of settlement agreements by a bankruptcy court and seeks to burden a practical business judgment with demands for costly, overly time consuming and highly detailed assessments.

██ In deciding whether to accept a settlement agreement that discharges legal claims held by the debtor, a bankruptcy court should consider the following factors:

> (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the ex-

---

**10.** As it happens, it was Judge Feeney on remand in the Bankruptcy Court who ruled that the purchaser had failed to establish that it made "all appropriate inquiry" for acquiring property, as required for "innocent landowner" defense under the Comprehensive Environmental Response, Compensation, and Liability Act. *In re Hemingway Transp., Inc.,*

174 B.R. 148, 169 (Bankr.D.Mass.1994) ("while representing it made all appropriate inquiries, [purchaser] did not in fact make such inquiries."). Under the circumstances, it is apparent Judge Feeney was fully conversant with the limitations to the application of *Hemingway* in the instant context.

pense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise. *High Voltage*, 403 B.R. at 167 (quoting *Jeffrey*, 70 F.3d at 185). Other factors may also include the experience and competence of the trustee and public policy considerations. *Id.*

■■■■■■ As noted by the First Circuit, in reviewing a settlement agreement for approval purposes, "[t]he [bankruptcy] judge ... is not to substitute her judgment for that of the trustee, and the trustee's judgment is to be accorded some deference." *In re Healthco*, 136 F.3d at 50 n. 5 (quoting *Hill v. Burdick (In re Moorhead Corp.)*, 208 B.R. 87, 89 (1st Cir. BAP 1997)); *In re 110 Beaver St. P'ship*, No. 08–2408, 2009 WL 4874783, at *4 (1st Cir. Dec.17, 2009) ("the trustee is accorded a significant range of discretion in the prudent exercise of business judgment."). Instead, the task of the court is to determine whether the settlement meets at least the "lowest point in the range of reasonableness." *In re Healthco*, 136 F.3d at 51 (quoting *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983)).

Here, the Bankruptcy Court did not abuse its discretion in approving the Settlement Agreement but rather correctly applied the relevant legal standard. In doing so, the Bankruptcy Court weighed the probability of success in litigation being compromised taking into consideration the complexity of the factual and legal issues related to this case. *In re Wolverine*, 2009 WL 1271953, at *4–5. Specifically, the court noted that the complex nature of the method used by the PBGC in determining the amount of unfunded liabilities and the existence of competing public poli-

cies under ERISA and the Bankruptcy Code. *Id.* at *4. In addition, the court found that the Trustee was an experienced attorney known for competence and integrity who, the court concluded, had ably performed her duties under 11 U.S.C. § 704. *Id.* at 5. Ultimately, the court concluded that the Trustee had properly exercised her business judgment in reaching the Settlement Agreement. *Id.* The Bankruptcy Court properly exercised its review role in reaching the conclusion that the Settlement Agreement is fair and reasonable.

## IV. CONCLUSION

For the reasons set forth more fully above, the Bankruptcy Court's Order overruling the objections to the Settlement Agreement filed by Crawford and approving the Settlement Agreement is AFFIRMED.